Argued October 6; modified December 20, 1938; petition for re-
hearing granted March 28; argued on rehearing April 18;
former opinion sustained June 6, 1939

SELMAN ET UX. *v.* SHIRLEY ET AL.

(85 P. (2d) 384, 91 P. (2d) 312)

Department 1.

*E. R. Woods*, of Corvallis (John F. Conway, of Portland, on the brief), for appellants.

*Thomas M. Morris*, of Corvallis, for respondents.

ROSSMAN, J. This is an appeal by the plaintiffs from a decree of the circuit court which was entered in a suit instituted for the following purposes: (a) to correct the description of a parcel of real property contained in a contract wherein the plaintiffs undertook to purchase that property from two of the defendants, H. E. Shirley and his wife, Ruth; (b) to recover a judgment against the three defendants (the Shirleys and C. G. Blakely) upon charges that, through false representations, they induced the plaintiffs to undertake the purchase of that property; (c) to secure delivery of a deed to the above-described property which was placed in escrow concurrently with the execution

of the contract; (d) to restrain the Shirleys from proceeding further with an ejectment action instituted by them for the purpose of removing the plaintiffs from the property; and (e) to gain judgment for the costs and disbursements of this suit.

The property with which this suit is concerned is 160 acres of land located in Benton county. In the aforementioned contract, which was executed by its parties (the plaintiffs and the Shirleys) July 1, 1933, the plaintiffs agreed to purchase this property for a consideration of $2,000, payable $500 upon the execution of the contract, and the balance in annual installments of $200, payable October 1 of the ensuing years. Defendant H. E. Shirley was the record owner of the property, and defendant C. G. Blakely was the agent who consummated this transaction. His commission was paid by H. E. Shirley, and we are satisfied that he was the defendants', and not the plaintiffs', agent. The circuit court, in a part of the decree unaffected by this appeal, held that Blakely was not guilty of any fraud and dismissed the suit as to him. Shortly after the execution of the contract the plaintiffs assumed possession of the property and have retained it ever since. They have paid a total of $750 upon the purchase price. After they had refused to make the payment of $200, payable on October 1, 1935, and had claimed that nothing further was due to the Shirleys because of alleged misrepresentations concerning the property, the Shirleys instituted the action of ejectment previously mentioned. Shortly thereafter the suit which we are now reviewing was filed by the plaintiffs.

The complaint alleges, the answer admits, and the findings state that, through mutual mistake, the con-

tract failed to contain the correct description of the property. The decree, in a part not under attack by this appeal, corrects the error.

The findings state:

"The defendant, H. E. Shirley, knowingly and falsely represented to plaintiff that there was at least 4000 cords of wood on said premises; that said representations was false and was made by defendant H. E. Shirley with the intention of inducing plaintiffs to purchase said premises; that the plaintiffs in purchasing said premises relied upon said representations."

We have read carefully the transcript of evidence and are well satisfied that it fully supports the above findings. The uncontradicted testimony also indicates that Shirley represented that timber of that kind was worth 50 cents a cord as stumpage. These were material representations, and it is clear that the plaintiffs would not have signed the contract of purchase had they not been deceived into the belief that 4,000 cords of firewood were upon the place. The fraudulent representation was made in a letter, dated May 23, 1933, which Blakely sent to the plaintiffs after he had told Shirley that the plaintiffs wanted to know how much timber stood upon the place. Blakely, in relaying to the plaintiffs Shirley's reply, stated in this letter: "He said there was at least 4000 cords of wood on the place."

The plaintiffs had a debtor who possessed a truck and who proposed to cut the timber into firewood and thus, besides working out his debt, enable the plaintiffs to pay the purchase price of the property. Blakely was aware of this circumstance when he inquired of Shirley concerning the exact amount of timber upon the property; in fact, his letter from which we quoted con-

tinues, thus: ''With your truck that you spoke of you could go right into the wood and have that place paid for in no time right there.''

■ The plaintiffs, S. W. and Nona Selman, husband and wife, visited the property in company with Blakely May 23, 1933, a few hours before the aforementioned letter was written, but neither they nor he had been upon the property before. The plaintiffs were strangers to this state. The husband was at that time a seaman in the United States navy, and his wife was a dressmaker in Altadena, California. Neither of them had had any experience upon farms and neither knew anything about timber or land values in this state. They arrived in Corvallis May 23, 1933, and at once called upon Blakely who was a real estate agent, and a stranger to them. Blakely at once took them to this property. While standing in a small clearing he pointed to an old rail fence which marked the south line, and he also indicated as best he could the east line, but had no knowledge of the other boundaries. Rain and low-hanging clouds partially obscured the view toward the higher elevations upon which the timber was supposed to stand. The ground was very muddy, which circumstance, together with the fact that Blakely did not know the boundary lines, dissuaded the party from proceeding further. As a matter of fact, the land had been logged off in 1918 when everything merchantable was taken. The tract was surrounded by tall timber, but, since no one in the party knew the boundary lines, none knew whether the timber which they saw was upon this property or not. This cursory examination of the property, followed by misrepresentations, clearly did not preclude the plaintiffs from relying upon the latter: *Southern Oregon Orchards Co. v.*

*Bakke*, 106 Or. 20, 210 P. 858. After their brief visit to the tract the plaintiffs left for California, and Blakely called upon Shirley, telling him that the plaintiffs were interested and wanted to know how much timber was upon the tract. Shirley, according to Blakely, replied, "If they didn't touch the wood upon the place, that if they would get fifty cents a cord for it, there would be enough to pay for the place, figuring there should be, he said, 4000 cords on it." Still later in the day Blakely wrote the letter from which we have already quoted. After its receipt the plaintiffs signed the contract above mentioned. As a matter of fact there were only 200 cords of wood upon the property. Shirley's version of the above conversation follows: "I told him that there was timber enough in the place, if they would cut it, would pay for the place and all they would be out would be their labor. * * * I figured there was a thousand cords on the place and if it was cut and all they would be out would be their labor. Now, that is the way I told him (Blakely) * * * so he misunderstood me, I suppose." Next, he was asked and answered as follows:

"Q. Did you ever at any time figure there was 4000 cords of wood on the place? A. Never."

Mrs. Selman returned to this tract in the early part of August, 1933, for a visit of three days. She was accompanied by the aforementioned truckman who, after viewing the tract, reported that there was no timber upon the property worth cutting. Promptly upon learning the truth Mrs. Selman protested to Shirley, telling him, "We have been lied to, * * * and something has to be done." According to Shirley, "she was pretty much up in the air about it. She said that she understood that there was 4000 cords of wood on

the place and bought it with that understanding." Shirley told her that he had not made the statement attributed to him in Blakely's letter, and accordingly she sought out Blakely who insisted that the statement in the letter represented Shirley's own words. The next day Mrs. Selman arranged a meeting between Blakely and Shirley which she attended. According to her uncontradicted description, the following occurred: "Mr. Shirley come in and Mr. Blakely says, 'You know you told me this' and Shirley says, 'I didn't,' and I said, 'Something has got to be done because when my husband finds this out, hell is going to pop; he is away and he is in the navy,' and I was there alone and no way to do anything. So it was suggested taking it to court, Mr. Blakely says, 'If you take it to court, I am with you, don't forget it.' I said, 'I will' and walked out." She was then compelled to return to California.

Mrs. Selman returned October 12, 1934, and has made her home upon the property ever since. At that time her husband had a brief leave of absence from the navy and he, too, was upon the property. An installment of $200 was payable at that time upon the contract. The Selmans called upon Shirley, and Mrs. Selman told him "something had to be done about those misrepresentations of his before he would do anything further." A discussion followed and, according to Mrs. Selman, Shirley assured them "that he was willing to do what was right and to adjust the wrong, and we went ahead and paid it under those conditions, that he would make good the false representations. We paid him with that understanding." Her husband gave like testimony. The payment was made October 13, 1934. While Shirley admitted that Mrs. Selman repeatedly claimed that the plaintiffs had been deceived

into the belief that there were 4,000 cords of wood upon the property, he claimed that when the October, 1934, installment was paid nothing was said concerning the false representations. When the installment which was due in October, 1935, was payable, no adjustment had been made. The plaintiffs again protested and asked for redress, but when nothing was done by the Shirleys they withheld the payment.

Shirley, after giving the testimony which we have already mentioned, made the following answer to a question of the trial judge: "I told him (Blakely) this statement that I just made, that I figured that there was wood enough on the place to pay for it." Next, Shirley admitted that Blakely, in the conferences preceding the trial, corroborated the Selmans' claims of deceit. Two more questions by the trial judge brought the answer which we have already quoted in which Shirley admitted that he told Blakely, "I figured that there was wood enough on the place to pay for it." In other words, he denied stating there were 4,000 cords of wood on the place, but admitted saying there was enough to pay the purchase price of the property, $2,000. He made this admission, however, only after this suit was brought. When the plaintiffs called upon him and sought an adjustment of their claim he refused to admit anything, even though Blakely reminded him of their conversation preceding the letter of May 23.

■ We repeat that, in our opinion, the record clearly supports the aforementioned finding of the circuit court which declares that the plaintiffs were deceived into the purchase of this property through a false representation that there were 4,000 cords of wood upon the property possessing a stumpage value of 50

cents per cord. It will be further observed that through promises of future adjustment, to which the plaintiffs were peculiarly susceptible due to their absence from the state, they were induced to make the payment of October, 1934. They, possibly, have lost the right to a rescission.

■ The plaintiffs also claim that they were deceived by a representation that a stream which they saw upon their visit to the land in May, 1933, flowed throughout the year and supplied enough water to irrigate ten acres. Besides inquiring about the timber, the plaintiffs had also inquired of Blakely about the stream. In a letter to them Blakely stated: "This stream does run the year round and the owner told me the next day after you were here that it is a dandy trout stream and that he has caught lots of trout in it. There is plenty of water in this stream, as I told you, to irrigate ten acres of the farm. You need have no fear that you wouldn't always have good water in this creek." Blakely knew nothing concerning the stream from his own observations and swore that the letter was a true narrative of Shirley's statement. A witness who had overheard the conversation between the two men corroborated Blakely, stating that Shirley had said, "It was a year round stream and that he (Shirley) had irrigated ten acres." Shirley admitted that Blakely had inquired of him concerning the stream, and then swore: "I told him that there was approximately ten acres that was available to the ditch that was in there * * * and there was anyhow ten acres there that could be irrigated from this ditch that was in there if it was properly handled." But, referring to the irrigating ditch, he explained: "That land won't hold the water and it seeps away about as fast as it

runs in there and when it hits a gopher hole it is gone.''
According to Shirley, a flume is required. However,
the witness swore that the stream dries up in the
summer months and, under the best of circumstances,
does not flow sufficient water to irrigate even a small
garden patch. The circuit court found that Shirley had
made the statement contained in Blakely's letter, but
made no finding concerning its truthfulness. We are
satisfied that the evidence warrants a conclusion that
the representation was false.

The findings state that the property was ''of the
fair market value of $2,000 at the time said contract
was entered into, to-wit: July 1, 1933; that plaintiffs
have suffered no damages, having agreed to pay $2,000
for said premises.'' The sole issue upon which we
deem it necessary to express an opinion is whether the
plaintiffs are entitled to (1) the benefits of their bar-
gain; or (2) no damages because the market value of
the land equals the sum which they agreed to pay.

■ As we have stated, the plaintiffs retained posses-
sion of the property after they discovered the fraud
which had been practiced upon them. It has been many
times stated by this court that a defrauded party is not
required to rescind the contract in order to sue for
deceit, and that if he affirms the contract he does not
thereby waive his right to recover damages for the
fraud which had been practiced upon him.

The plaintiffs argue that they are entitled to the
benefit of their bargain which contemplated that they
should have, not only 160 acres of land but also a
growth of timber upon the land aggregating 4,000 cords
and a good irrigating stream; and that the rule which
measures their damages should be based upon that
premise. The defendants contend that this court has

rejected the benefit-of-the-bargain rule in favor of the rule which grants damages equal only to the out-of-pocket loss. The rule championed by the plaintiffs would certainly be available if this action were based upon a warranty and were, therefore, contractual in nature. In support of their contentions that this court has rejected the benefit-of-the-bargain rule in fraud actions, the defendants cite *Columbia River Door Co. v. Priest,* 128 Or. 359 (274 P. 116); *Lichtenthaler v. Clow,* 109 Or. 381 (220 P. 567); *Hooning v. Henry,* 106 Or. 605 (213 P. 139); *Southern Oregon Orchards Co. v. Bakke,* 106 Or. 20 (210 P. 858); *Johnson v. Meyers,* 91 Or. 179 (177 P. 631); *Ward v. Jenson,* 87 Or. 314 (170 P. 538); *Salisbury v. Goddard,* 79 Or. 593 (156 P. 261); and *Van de Wiele v. Garbade,* 60 Or. 585 (120 P. 752).

Of the above decisions the only ones which indicate comparison of the two rules for measuring damages are *Ward v. Jenson* and *Lichtenthaler v. Clow.* The decision in *Ward v. Jenson* states that the circuit court had instructed the jury:

"The measure of damages in this case is the difference between the value of the land as it would have been if it was as represented, and the actual market value * * *."

The decision states:

"This instruction was erroneous. It is settled in this state that in an action to recover damages for false representations inducing an exchange of property the measure of damages is the difference between the market value of the property parted with by the person defrauded and the market value of the property received by him."

We shall state the facts before this court in that case later, but before doing so we shall consider *Lichtenthaler v. Clow,* supra. From it we quote:

"There is a sharp conflict of opinion between the courts as to some classes of misrepresentations; but as to other classes there may be a substantial harmony of opinion, or if as to some kinds of misrepresentations there be any contrariety in the judicial views, the differences may not be very marked. Cases dealing with misrepresentations concerning quantity, condition and value are, on the question of measurement of damages, divided into two classes: (1) those which measure the damages by ascertaining the difference between the actual value of the property received and its value if it had been as it was represented to be; and (2) those which measure the damages by ascertaining the difference between the actual value of the property and the amount paid for it: See Van de Wiele v. Garbade, 60 Or. 585, 591 (120 Pac. 752); Zobrist v. Estes, 65 Or. 573, 578 (133 Pac. 644); Benson v. Murton, 66 Or. 199 (133 Pac. 340, 1189); Robertson v. Frey, 72 Or. 599, 604 (144 Pac. 128); Caples v. Morgan, 81 Or. 692, 704 (160 Pac. 1154, L. R. A. 1917B, 760); Purdy v. Underwood, 87 Or. 56, 62 (169 Pac. 536).

"There is also a sharp conflict of opinion between the cases dealing with misrepresentations concerning the identity and location of real estate. When the misrepresentations relate to title or encumbrances the courts appear to be in substantial harmony as to the rule for measuring damages. When the misrepresentations relate to quantity, the rule applied is not always the same; for it will be found upon an examination of the precedents that the rule of measurement is dependent upon the facts of the case. * * *."

In Columbia River Door Co. v. Priest, supra, the facts were that the Morgan Razor Works, a corporation, had exchanged some personal property which it owned for some timberlands owned by the defendants. Two years later the plaintiff, owner of all of the capital stock of the razor works, claimed that the defendants had fraudulently misrepresented the quantity of timber upon the land. The defendants claimed that

they were the real victims of the cozening, if any had taken place, and asserted that they had received only a small part of what the trade contemplated that they should have received. The part of the decision upon which the defendants rely is the following:

"If the defendants' contention be true that plaintiff was not damaged in this exchange of property, even though false representations were made, that, of course, would preclude a recovery by the plaintiff."

No effort was made to state the rule which governed the measurement of damages, and the quoted language, it will be observed, lends no support to the defendants' contention when construed in the light of the facts just mentioned.

*Hooning v. Henry,* supra, was an action in which the plaintiffs sought to recover damages on account of alleged misrepresentations made by the defendant in inducing the plaintiff to purchase a used automobile. The portion of the decision material to the contention advanced by the defendants in the instant action is the following:

"The principal contention here is that the court erred in instructing the jury that the measure of damages would be the difference between the agreed purchase price of the automobile, namely, $1,200, and the reasonable market value of the machine at the time of purchase, and in refusing to instruct that the measure of damages was the difference between the value of the property as represented and its actual condition. We are aware that there is a difference among the courts as to the measure of damages in cases of misrepresentation, but this court is committed by the case of Southern Oregon Orchards Co. v. Bakke, 106 Or. 20 (210 Pac. 858), to the rule laid down by the Circuit Court, to which we still adhere."

The evidence had been confined to the special damages and the market value of the machine at the time of its purchase. It is evident that the rule which the defendant embraced in his requested instruction would not have been germane to the proof.

*Southern Oregon Orchards Co. v. Bakke,* supra, was an action upon a note of $100 in which the defendant, by way of counterclaim, alleged that he was induced to purchase a tract of land from the plaintiff and execute the note in part payment thereof through fraudulent representations made by the plaintiff concerning the land. From a judgment in favor of the defendant, the plaintiff appealed. The only part of the decision material to the inquiry in which we are engaged is the following:

"Another assignment of error is based upon the following instruction: 'Now in case you should find that under the rule of law as I shall give the same to you, that the defendants were damaged in any amount, I instruct you that the rule of damages applicable would be that the damages would be the difference between what the defendant paid for the property and its fair market value at the time of entering into the contract. It would make no difference that he might later be able to sell the property for more than he paid for it.' This charge clearly states the law."

The judgment of the circuit court was affirmed. Since the out-of-pocket damage rule is more favorable to fraudulent parties than the rule which gives the defrauded party the benefit of his bargain, it is evident that the plaintiff (the fraudulent party) had no occasion to criticise the quoted instruction.

*Johnson v. Meyers,* supra, was an action by an individual, who had contracted to haul some cordwood out of the forest, to recover damages on account of

alleged misrepresentations which he claimed induced him to enter into the undertaking. He averred that if the facts had been as represented he would have earned a profit of $840 instead of incurring a loss of $5,287.04. The trial resulted in a verdict and judgment in his favor in the amount of $4,281.84. We now quote from the decision:

"It is also contended that 'damages which were within the contemplation of the parties or which were the necessary or natural consequences of the fraud only can be recovered.' That is the law and as we construe the record it is the theory upon which the case was tried and upon which the court instructed the jury. The defendants maintain that 'the damages recovered must be limited to the actual loss sustained by reason of the fraud' and that 'prospective and uncertain profits cannot be recovered.' That is the rule laid down in Smith v. Bolles, 132 U. S. 125, 33 L. Ed. 279, 10 S. Ct. Rep. 39, where the court says: * * * * ''

The decision next quoted from *Rockefeller v. Merritt,* 40 U. S. App. 666, 76 Fed. 909, 22 C. C. A. 608, 35 L. R. A. 633. The instructions to the jury permitted the recovery of the alleged profit, if the jury was satisfied that it would have been earned had the facts been as represented. The decision, referring to the two federal decisions just mentioned, said: "Under the authorities above quoted, we think this was error," meaning the instruction, but held that, due to the absence of exceptions, the issue was not before the court. The judgment was affirmed.

In *Salisbury v. Goddard,* supra, the plaintiffs, who had traded a parcel of real property for the furnishings and lease of a hotel, alleged that they were induced to make the trade through the defendants' false representations concerning the hotel. The ver-

dict and judgment were in their favor. This court's decision, after holding that reversible error had been committed in the reception of testimony, continued thus: .

"In view of the conclusion thus reached, it is deemed essential to consider another alleged error in order to prevent its recurrence at a retrial of this cause. It will be remembered that this was not a suit for rescission, but it is an action at law to recover damages. If, therefore, the plaintiffs received property of equal value of the lot which they conveyed, and the money they paid, they were not injured and sustained no damages: Van de Wiele v. Garbade, 60 Or. 585, (120 Pac. 752); Robertson v. Frey, 72 Or. 599 (144 Pac. 128)."

In determining the significance of that language, it is desirable to bear in mind the fact that the defendant claimed that the real property with which the plaintiffs parted was not worth its represented value.

In *Van de Wiele v. Garbade,* supra, the plaintiff alleged that through the defendant's fraudulent representations, he had been induced to purchase 37½ shares of the capital stock of a corporation, paying for it $3,750, its par value. One of the alleged fraudulent representations upon which he depended was that the stock was worth more than par, but he demanded judgment for no more than he had paid. A principal issue upon appeal was whether the cause was a suit in the nature of a rescission or an action for damages. In affirming the judgment of the circuit court, this court employed the language upon which the defendants apparently rely:

"True enough the plaintiff brings into court the certificates of stock, alleging a previous tender and demand of the money; but this is not controlling in the premises. After verdict, the pleading may be well

construed to be an action for damages proceeding upon the affirmance of the contract. On this theory, if the plaintiff is successful, his measure of damages would be what he paid for the stock, after deducting from that sum the reasonable value of the stock at the time of purchase. If, in fact, the stock was utterly worthless, his measure of damages in the action at law would be the full amount he paid; for in the final calculation there would be nothing in the shape of stock value to diminish the purchase price. If the stock had no value, the reason for the distinction in law between an action in affirmance of the contract, and an action in disaffirmance of the same would fail, and the reason having failed the distinction itself would fail. Under such circumstances, to return the stock is a mere act of grace, which does not prejudice the action for damages.''

Since the plaintiff sought recovery for no more than he had paid for the stock, although depending upon a representation that it was worth more than par, he was not asking for the benefit-of-the-bargain rule, and, hence, this court was not called upon to make a choice between the two rules. The quoted language was employed only for the purpose of indicating that the cause was not of equitable cognizance—the certificate tendered into court was worthless, and, hence, its tender was not an indication that a rescission was sought.

The above constitutes a review of all the authorities cited by the defendants. We believe that we have discerned and quoted the part of each upon which the defendants rely. *Ward v. Jenson, Columbia River Door Co. v. Priest,* and *Salisbury v. Goddard* arose out of exchanges of properties. The first of these is representative of the other two. In that case the plaintiff, owner of a parcel of Oregon property, exchanged it for a tract in California. She claimed that the defendant

had falsely represented the nature of his title, the acreage within the tract, the amount which he had spent upon improvements, the capacity of a pump which constituted a part of the irrigation system, the amount of time required to pump water to the land's level, the amount expended for the orange trees growing upon the land, etc. In addition, a controversy developed concerning the value of the Portland property. It is manifest that an Oregon jury would have been compelled to resort to guesswork in endeavoring to determine the value of the California property had it possessed the features which the defendant claimed for it. This is especially true since the record contained no intimation of the market value of any property possessing those qualities. Under these circumstances, the market-value rule was the only one which could compel resort to known values. In *Van de Wiele v. Garbade* this court was not called upon to make a choice between the two rules for the measurement of damages. In *Lichtenthaler v. Clow* the two rules were defined, but no preference was stated. In *Hooning v. Henry* the parties evidently tried their case under the out-of-pocket-loss rule. *Johnson v. Meyers,* while possibly containing some intimations that the benefit-of-the-bargain rule is not available in this state, nevertheless, affirmed a judgment in which purported profits were allowed the victim of the fraud. Before attempting to come to a conclusion, we deem it well to consider three additional decisions of this court.

In *Robertson v. Frey,* 72 Or. 599, 144 P. 128, the plaintiff, who had sold a parcel of Oregon property to the defendant, accepting in part payment a tract of Iowa land, sought damages on account of alleged fraudulent representations concerning the latter. There

was no controversy over the Oregon property nor its value. The defendant had represented that his Iowa tract, which the plaintiff had never seen, consisted of 40 acres, and that it was worth $2,500. The truth of the matter was that the Iowa land was located upon the Missouri river and that, due to erosion, only 27.16 acres remained. It was worth between $10 and $20 per acre. The circuit judge, now Mr. Justice KELLY of this court, instructed the jury:

"The measure of damage in this case is the difference between the value of the land as it would have been if it was as represented and its actual market value."

The jury returned a verdict for $2,500. A motion for a new trial was overruled on condition that the plaintiff file a remittur in the sum of $400. The judgment of the circuit court was affirmed, the decision stating:

"The authorities as to the rule governing the measure of damages in cases of fraud are inharmonious. This is sometimes due to the difficulty of framing a definite rule which will give proper compensation to the injured party under varying states of facts."

Here, it will be observed that the evidence afforded the jury something definite upon which it could base a conclusion as to values; that is, the value of the Oregon property was admitted by the defendant, and he himself had represented that the Iowa property was worth $2,500. Under those circumstances, the defrauded vendee obtained the benefit of the bargain.

*Purdy v. Underwood,* 87 Or. 56 (169 P. 536), and *Cawston v. Sturgis,* 29 Or. 331 (43 P. 656), fall into the same general category as *Lichtenthaler v. Clow,* supra. In each of them a purchaser, whose contract entitled

him to a larger tract of land, accepted less, unaware of the shortage and, upon discovering the truth, instituted an action for fraud. In the Lichtenthaler decision this court held that in the absence of special circumstances the vendee is entitled to recover such portion of the purchase price, less the value of the improvements, as the deficiency bears to the area described in the contract. In *Purdy v. Underwood,* supra, the plaintiff purchased, at a price of $50 per acre, a tract from the defendant which the latter represented contained 112½ acres. Later the plaintiff conveyed the land for a valuable consideration to a third party, and still later discovered that it contained only 78.76 acres. He then brought the action under review charging fraud. The trial resulted in a judgment in his favor in the amount of $1,687. The defendant, upon appeal, in addition to pointing out that the plaintiff was not liable to his vendee for the shortage, argued that no recovery was permissible because in this state "the measure of damages in such cases is the difference between the actual value of the property at the time of the purchase and the price paid therefor." Disposing of this contention, the decision stated:

"The legal principle invoked by defendant's counsel is applicable where property is exchanged."

In conclusion, the decision held:

"Though the evidence fails to show what consideration was given by Mrs. Purdy for the land it will be assumed without deciding the question, that her deed was intended to be absolute, and whether she gave only one dollar as stated in the instrument, or paid more than the defendant received for the land is unimportant, for the plaintiff was legally entitled to make such disposition of the real property as he pleased."

In *Cawston v. Sturgis,* supra, the defendant, through the fraudulent representation that an irregular plot which he showed to the plaintiff contained two and one-half city lots, induced the plaintiff to purchase it. The tract contained only two lots. In affirming a judgment for the plaintiff, the decision stated:

"The contention for the defendant is that the measure of damages is the difference, if any, between the value of lot five as it actually existed and what plaintiff paid for it; and, in accordance with this view, he offered to show that the tract was actually worth the purchase price, although not as large as represented by the defendant. But, according to the verdict of the jury, the plaintiff paid for and supposed he was buying land equal in area to two lots and a half, when in truth and in fact he actually received land in area equal to little over two lots; and if, by the fraud of the defendant, he was deceived and paid for more than he actually received, it seems to us the minimum recovery should be the amount paid for the deficiency, irrespective of the actual value of the true tract."

It will be observed that in the three decisions just reviewed the defrauded party got the benefit of his bargain and that the out-of-pocket-loss rule was not employed. In one of them (*Purdy v. Underwood*) the out-of-pocket-loss rule was expressly rejected, the decision declaring that it is "applicable where property is exchanged." The fact that the defrauded party had sold the property and had, possibly, received for it more than he paid was deemed immaterial.

The rule which gives to the defrauded party the benefit of his bargain is favored by the textbook writers. The following is quoted from Williston on Contracts (Rev. Ed.) § 1392:

"Not all courts allow the same damages to a buyer who has been induced to buy by fraudulent representations and sues for the deceit as to a buyer who sues

for breach of warranty. The contrary view, confining the damages in deceit to the value of what the plaintiff parted with, less the value of what he received, has the support of the Supreme Court of the United States, and of some state courts. This also seems to be the law of England. At first sight it may seem that the latter rule is clearly and universally correct, confining as it does the plaintiff's recovery to a restitution of what he lost by entering into the transaction. The real explanation of the broader rule, at least in cases of sales of goods, seems to be that the defendant in deceit is not simply a fraudulent person; he is a warrantor of the truth of his statements. The injured person may, because of fraud, elect to rescind the transaction and claim restitution of what he has parted with, or he may demand that the representations be made good. Ordinary warranties where no fraud exists may be enforced by action of tort. The addition of the element of deceit cannot deprive the injured person of the rights which would be his if this element were lacking, and if the representation on which he relied were a warranty and nothing more. Nor is a strictness of pleading to be defended that denies to a plaintiff the relief that would be his if he omitted an allegation that the representation of the quality of goods, of which he complains, was fraudulent. A practical reason for the enforcement of the broader rule may be found in the fact that under the other rule a fraudulent person can in no event lose anything by his fraud. He runs the chance of making a profit if he successfully carries out his plan and is not afterward brought to account for it; and if he is brought to account, he at least will lose nothing by his misconduct. * * * Any universal statement, therefore, that the damages for fraudulent misrepresentation are the difference between the law governing sales of goods and that governing other transactions may explain some apparently inconsistent decisions.''

Sedgwick on Damages (9th Ed.), § 1027, in stating the measure of damages where fraud is employed in the course of a sale of land, declares:

"In such actions, as in actions for fraud in the sale of chattels, it has usually been held that the measure of damages is the difference in value between the land as it would have been if as represented and as it actually was."

The rule is thus stated in 27 C. J., Fraud, § 243, p. 92:

"The measure of the damages sustained by the purchaser where a purchase has been induced by fraud, is according to the weight of authority, the difference between the real value of the property purchased and the value which it would have had had the representations been true. This rule is based upon the theory that a defrauded party is entitled to the benefit of his bargain and should be placed in the same position that he would have occupied had the false representations upon which he acted been true."

Sutherland on Damages (4th Ed.), § 1172, in criticizing the out-of-pocket-loss rule, states:

"As said by Mr. Justice Gray, 'to allow the plaintiff only the difference between the real value of the property and the price which he was induced to pay for it would be to make any advantage lawfully secured to the innocent purchaser in the original bargain inure to the wrong-doer; and, in proportion as the original price was low, would afford a protection to the party who had broken, at the expense of the party who was ready to abide by, the terms of the contract.' The amount paid is evidence of the value, but on principle and according to the general course of decision is not conclusive of the value as it was represented to be."

However, the Restatement of the Law of Torts, § 549, embraces the out-of-pocket-loss rule. We quote from it the following:

"The measure of damages which the recipient of a fraudulent misrepresentation is entitled to recover from its maker as damages under the rule stated in

§ 525 is the pecuniary loss which results from the falsity of the matter misrepresented, *including*

(a) the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it,

(b) * * *''

Williston on Contracts (Rev. Ed.), § 1392, referring to the section of the Restatement just quoted, declares that it ''adopts the minority rule.'' Professor Williston continues that under the maxim adopted by the Restatement, ''if fraudulent representations constitute a warranty also, recovery may be had on that basis''; that is, the defrauded party obtains the benefit of his bargain. Many authorities are digested in the following annotations: 108 A. L. R. 1060, 57 A. L. R. 1142, and 8 L. R. A. (N. S.) 804. See, also, 12 R. C. L., Fraud and Deceit, §§ 198 and 199, pp. 452 and 453.

Professor Charles T. McCormick, in a treatise appearing in 28 Ill. Law Rev. 1050, states:

''In few of the states have the courts seized upon one of these formulas and applied it with entire consistency in all classes of cases. * * * In land sales also many courts seem to treat differently cases where the quality or character of the land has been misrepresented from those in which the false statement relates to its title, identity or quantity.''

As a footnote to this statement he quotes from that part of Mr. Justice HARRIS' opinion in *Lichtenthaler v. Clow*, supra, which indicates that the rule governing the measurement of damages in fraud actions has been applied in a flexible manner. In a preceding paragraph of this opinion we set forth the same excerpt. Professor McCormick approves the nonuniform manner in which these rules for the measurement of damages have been applied by the courts, and urges that ''a technique

should be developed by which both of these formulas shall be made available, so that one or the other may be used as the circumstances of the case may demand." Other authorities, as we shall now show, have also taken note of the pliable nature of the formula. In 27 C. J., Fraud, § 246, p. 97, the editor states:

"In some jurisdictions the courts, while in the main adhering to one or the other of the rules stated in one of the preceding sections, have recognized certain limitations and qualifications."

This statement is followed by a review of the decisions of Arkansas, California, Colorado, New Jersey, New York and Texas which shows that in those states the courts have applied the rule measuring damages in fraud actions in a variable manner. An extensive annotation in 8 L. R. A. (N. S.) 804, which reviews the decisions dealing with the measure of damages for fraudulent representations in real estate transactions, indicates still further that the courts do not always apply the same rule. The compiler of that annotation deduced the following as the rule generally applied:

"Where a representation is made as to the value, quality or condition of real estate, the majority of the courts apply the rule that a defrauded vendee is entitled to the difference between the actual value of the property received and its value had the representations as made been true."

A single illustration will indicate the flexible application which the rule has received: Minnesota subscribes to the out-of-pocket-loss rule, yet in *Shane v. Jacobson*, 136 Minn. 386, 162 N. W. 472, the plaintiff, who had been induced to purchase a farm at a price of $17,300 upon a representation that the east 80 acres of it were tiled, was held, notwithstanding the out-of-pocket-loss

rule, to be entitled to damages equal to the expense of installing the missing tiling. It will be observed that the guide employed was, in fact, the benefit-of-the-bargain rule. In substantiation of the statement just made, we quote the following from Professor McCormick's article previously cited:

"If at reasonable cost property sold can be made to conform to the representations of the seller, to allow the buyer to recover this amount is a logical application of the principle of which the 'loss of bargain' rule is founded. Thus, when the seller of a farm falsely represented that the well gave good water the buyer was allowed the cost of a new well. And a purchaser * * * ,"

We come now to an effort to reconcile our decisions and to deduce a rule therefrom. First of all, it is evident that the party guilty of fraud is liable for such damages as naturally and proximately resulted from the fraud. This is the universal rule. Next, our decisions warrant the conclusions: (1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule; (2) if the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone; (3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and (4) where, as in *Robertson v. Frey*, supra, the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed.

■ In the present instance, the plaintiffs are clearly the victims of a fraud. The representations which deceived them concerned the quality or condition of the property; they were willful, were phrased in positive terms and were made in writing. They were made with knowledge upon the part of Shirley that the plaintiffs were ignorant of the facts and desired information. A determination of the value of the property, had it been as represented, does not carry one into the field of conjecture, but resort may be had to values for which Shirley and other witnesses vouched; that is, 4,000 cords of stumpage were worth $2,000. Had Shirley's representations been true, the plaintiffs would now have not only the land but also the timber. They should not be compelled, because Shirley was dishonest, to be content with the land only. Through false representations Shirley should not be permitted to obtain for the logged-off land a sum which would have been refused him had he been honest and truthful. In this case we are satisfied that Shirley must have known that through his deceit the plaintiffs would lose the benefit of the bargain which he was inducing them to enter into. Thus, we get back to the one rule which is of universal application: the party guilty of the fraud is liable for such damages as naturally and proximately result from the fraud. We conclude that the plaintiffs are entitled to damages awarded upon the basis of 50 cents per cord for the difference between the represented 4,000 cords and the actual 200 cords. The balancing of these accounts will indicate that there is now $650 owing to the plaintiffs. The ejectment action should, of course, be restrained. The deed should be delivered to the plaintiffs. It may appear that under these circumstances the plaintiffs will obtain the land

for virtually nothing. There is, however, substantial evidence in the record indicating that without the timber and water for irrigation the land possesses virtually no value. While it is true that Shirley, Blakely and two other real estate agents expressed the opinion that this logged-off tract was worth $2,000, the effect of this evidence is greatly discredited by the representation, which induced the plaintiffs to make the purchase, that the land plus the 4,000 cords and served by a good irrigating stream was worth $2,000. But, be this as it may, courts ought not to be overnice in trying to save one who has willfully deceived another from the vicissitudes resulting from his wrong.

For the sake of completeness, we add that we have not overlooked the fact that the contract is still executory. The defendants have presented no issue upon that score, and the plaintiffs' position is fully sustained by many decisions of which *Hines v. Brodie*, 168 Cal. 507, 143 P. 729, is a good example.

The cause will be remanded to the circuit court for the purpose of adjusting the accounts of the parties in harmony with the above and of entering the modified decree.

RAND and KELLY, JJ., concur.

---

BELT, J. (dissenting). Regardless of what may be the rule in other jurisdictions, it is, as stated in *Ward v. Jenson*, 87 Or. 314, 170 P. 538, well settled in this state that,

"* * * in an action to recover damages for false representations inducing an exchange of property the measure of damages is the difference between the market value of the property parted with by the person

defrauded and the market value of the property received by him * * *.''

The same rule or measure of damages is adhered to in the later cases of *Parks v. Smith*, 95 Or. 300 (186 P. 552, 554); *Scott v. Wallace*, 102 Or. 22 (201 P. 542); *Greig v. Interstate Inv. Co.*, 121 Or. 15 (253 P. 877); *Columbia River Door v. Priest*, 128 Or. 359 (274 P. 116). I am unable to see any substantial ground for distinguishing the cases as done in the majority opinion. If this court is to adopt the ''benefit of the bargain'' rule in such cases, it should so declare in no uncertain language in order that trial courts may know how to proceed.

The measure of damages set forth in the majority opinion enables plaintiffs to acquire the 160-acre ranch for $100. If the representation had been 8,000 cords of wood, plaintiffs would get the ranch for nothing and the sum of $1,900 in addition. As stated in *Curtis v. Buzard*, 254 Pa. 61 (98 Atl. 777), and quoted in note 27 C. J. § 244, p. 96:

''One defrauded 'can deduct from the purchase-money the difference between what he agreed and what it was then actually worth, and in our opinion no more, for if he could exceed that measure of damages a vendee of land might get a man's land for nothing, by showing that had the land been as represented it would have been worth enough more than its actual value to wipe out all the purchase-money, and thus give the vendee the land for nothing.' ''

The measure of damages as heretofore stated by this court in numerous decisions is, in my opinion, sound and should not be overruled. See numerous cases cited in above note, 27 C. J. § 244, p. 96, among which is *Sigafus v. Porter*, 179 U. S. 116 (21 S. Ct. 34, 45 L. Ed. 113).

Neither am I able to agree that the land without the timber as represented is "virtually of no value." The conclusion as expressed in the majority opinion is contrary to the findings of the trial court and is not supported by the record.

For the foregoing reasons briefly stated I dissent.

Petition for rehearing granted March 28; argued on rehearing April 18; former opinion sustained June 6, 1939

## On Rehearing

(91 P. (2d) 312)

ROSSMAN, J. The brief accompanying the respondents' (defendants') petition for a rehearing contends that we erred when we applied in this suit the benefit-of-the-bargain rule. It cites no authorities not mentioned in our previous decision except pages 448 to 454, McCormick on Damages. Our decision quoted from a treatise written by the same author, published in 28 Ill. Law Rev. 1050, which apparently afforded the substance for the above-cited pages of his textbook.

We are likely to become so engrossed in efforts to formulate a rule of damages capable of precise application in all future cases and incapable of misapplication in any, that we may lose sight of our real duty in the present case; which is to sift out the charges of fraud, and, if it then appears that the alleged wrongdoer is guilty of the charges made against him, to enter judgment against him for all damages which are the proximate result of the wrong which he committed. Upon the reargument the defendants did not contend that the circuit court erred when it found that the charges of fraud were true, nor that we erred when we

adopted that finding. Hence, the ascertainment of what, if any, damages were the proximate result of the wrong is the only problem before us.

Regardless of whether the out-of-pocket-loss rule or the benefit-of-the-bargain rule is the correct one, the fundamental rule, universally employed, is the one just indicated: the victims of fraud are entitled to compensation for every wrong which was the natural and proximate result of the fraud. If that statement needs the support of authority, we quote from 12 R. C. L., Fraud and Deceit, p. 452, § 197:

"Under the general rule as to damages, the injured party is entitled to recover such damages as result directly and proximately from the fraud, which include those which were actually or presumptively within the contemplation of the parties when the fraud was committed."

See to the same effect *Preble v. Hanna,* 117 Or. 306, 244 P. 75, where this court held that all damages are recoverable which "naturally flow from the tortious act of the defendant with reasonable certainty."

In *Anderson v. Columbia Contract Co.,* 94 Or. 171, 184 P. 240, 185 P. 231, 7 A. L. R. 653, Mr. Justice HARRIS, on behalf of this court, said:

"The law aims to allow full and complete compensation to an innocent party who has been damaged by the breach of a contract or the commission of a tort. In practice, the law does not prove false to its theory * * *."

In *Gustafson v. Rustemeyer,* 70 Conn. 125, 39 Atl. 104, 39 L. R. A. 644, 66 Am. St. Rep. 92, the court, in a carefully prepared decision, said:

"We think the loss of the benefits of the bargain is one of the elements of damages which the defendant

must be held to have contemplated as the natural and proximate result of his conduct, and for which he is therefore answerable.''

In order to indicate the manner in which one writer, at least, has applied this simple formula in instances like the present, we quote the following statement made in Sutherland on Damages (4th Ed.) § 1171:

''The party guilty of the fraud is to be charged with such damages as have naturally and proximately resulted therefrom. He is to make good his representations as though he had given a warranty to that effect. He is to make compensation for the difference between the real state of the case and what it was represented to be. Thus, in cases involving sales, leases or other like contracts, where it appears that there is a fraudulently false representation of quantity, quality, price of title the measure of damages is the difference in value between that which is actual and that which was represented to exist.''

To facilitate its application the proximate result rule is often subdivided into four auxiliary rules: (1) A defrauded party is entitled to all out-of-pocket losses; (2) he is entitled to the benefit of his bargain; (3) if the property was falsely represented as improved with or containing some items which are not there, he is entitled to the cost of installing them; and (4) he is entitled to all consequential damages. These are merely subdivisions of the main rule, and are employed by the courts according to the facts and demands of the various cases.

Possibly the use of the term ''benefit-of-the-bargain'' is misleading in the present instance. Its use is capable of indicating that the plaintiffs will get a bargain in the event that they prevail. For the purpose of showing that they will not get a bargain and

of ascertaining whether the damages which they seek are the proximate result of the defendants' wrong, let us mention some facts to which we adverted only casually in our previous decision.

It will be remembered that the plaintiffs made only one visit to the place before signing the contract. It was a brief visit and afforded them an unsatisfactory impression of the property, due to a driving rainstorm and Blakely's lack of knowledge concerning the identity of the property. After the visit the plaintiffs, without tarrying in Corvallis for even a few minutes, immediately started upon their return trip to California, and upon reaching their home found awaiting them the letter which we shall now quote:

"Corvallis, Oregon
May 23, 1933.

Mrs. S. W. Selman
485 West Harriet Street
Altadena, California

Dear Mrs. Selman:

I was able to get in touch with the owner of the 160 acres this morning, and I believe after talking to him that we can get the deal on his 160 acres about the way I outlined to you yesterday. He was not so keen about waiting for two years for the payments to begin but I believe if you insist on this that he might do it. The $500.00 down payment is alright and the price of $2000.00 is alright. He told me this morning that he had a chance to trade this 160 acres and take a clear house in Los Angeles which they said was worth $5000.00 clear for his place clear, but he does not want property down there and has put the price right down in order to sell it. I think if you were here today we could drive up there to the place.

He said there was at least 4000 cords of wood on the place, and it is selling in Corvallis at $4.50 and $5.00

per cord now. It seems to me that it is an ideal place for your purpose.

You talked of graveling the road up there. The only expense involved for this would be your time and truck, as you can get all the gravel you want right there in that creek where we turned through the gate off the highway, at no cost.

He has the offer now as stated above, but I don't think he will take it, although they may decide to borrow money on the property there and pay for it in cash. I would suggest that you get in touch with me right away if you decide to take this farm and send along at least $100.00 or $200.00 to bind the deal until you can get up here. If you wanted to put in crops this year there is still plenty of time for a number of things, including all kinds of garden. He stated this morning that he had that creek ditched so he can irrigate about 10 acres if necessary, and if you got up here a little late you could put in a lot of garden and then if it got dry, you could turn the water on it and could raise a world of stuff this year. With your truck that you spoke of you could go right into the wood and have that place paid for in no time right there.

Let me hear from you one way or the other.

Yours very truly,

C. G. Blakely.''

''Corvallis, Oregon
June 1, 1933.

Mrs. S. W. Selman
485 West Harriet Street
Altadena, California

Dear Mrs. Selman:

I have your letter of the 29th in which you ask about the stream that runs through the 160 acres that I showed you when you were here. In answering your question, beg to advise that this stream does run the

year round and the owner told me the next day after you were here that it is a dandy trout stream and that he had caught lots of trout in it. There is plenty of water in this stream, as I told you, to irrigate ten acres of the farm. You need have no fear that you would not always have good water in this creek.

You may send your deposit to me and I will arrange to close with the owner immediately upon receipt of the deposit, and will arrange to have everything in order for you when you get here.

Thanking you for your letter and trusting I may hear again from you soon, I am

Yours very truly,

C. G. Blakely.''

Shortly after the receipt of this letter the contract was signed.

The representations in these letters are unequivocal. Their meaning is clear. They were intended to, and did, deceive the plaintiffs. Not one word of testimony was offered to show that Shirley had received an offer whereby he could have traded this tract for a California home worth $5,000 or any other sum. If that representation was true when made, the defendants certainly would have produced the offer rather than the opinion evidence, hereafter to be mentioned, concerning the value of the property. Had they received such an offer they would have accepted it and would not have been forced to resort to the culpable course of working off the tract upon these plaintiffs under a vanguard of fraudulent representations. All of the other representations in the letter of May 23 have been proved untrue. The representation about the 4,000 cords of wood was expressly found untrue in the findings of the circuit court. The representation about gravel being available for improving the road was likewise un-

true, unless there was somewhere a phantom gravel bed which Selman was unable to find and which Shirley placed in some mysterious site incapable of description. The representation that the creek was "ditched so he can irrigate about ten acres if necessary" Shirley himself virtually confessed was false. The sentence to which we have just referred continues: "If you got up here a little late you could put in a lot of garden." That was written on May 23, and although it deceived a California dressmaker and a seaman of the United States navy, no Oregon farmer could have been induced to believe it. The paragraph continues: "With your truck that you spoke of you could go right into the wood and have that place paid for in no time." This is the very representation which eventually clinched the deal, and is confessedly false. The letter of June 1 was apparently written after the defendants believed that the letter of May 23 might not suffice. Instead of the first letter bringing back a signed contract, it brought an inquiry concerning the purported irrigation stream. The letter of June 1 is a wordpicture of a stream that "runs the year round, * * * a dandy trout stream," and adds that Shirley "had caught lots of trout in it." The writer of the letter apparently felt that he needed more water, and so he continued: "There is plenty of water in this stream * * * You need have no fear that you would not always have good water in this creek." The truth of the matter was confessed by Shirley when, as a witness, he admitted that the water in the stream was so scant that pipes and a sprinkler system were necessary to water any part of the land.

This place was not a farm; it was not a wood lot; it was merely a tract of logged-off land no different in

kind from thousands of other tracts in the Coast Range. But the plaintiffs had no thought of buying a piece of logged-off land. Logged-off land was never mentioned in the negotiations. The plaintiffs wanted a wood lot where they could cut wood and sell it. They plainly so told Blakely. That is why his letter of May 23 states: "He (Shirley) said there was at least 4,000 cords of wood on the place. * * * It seems to me that it is an ideal place for your purpose." In other words, the plaintiffs had a definite purpose and acquainted Shirley's agent with it. It is evident that they wanted not only land but also standing timber capable of being cut into cordwood. In fact, they depended upon the wood and a truckman indebted to them who had promised to cut the trees into cordwood as a means of paying for their purchase. The defendants, in order to make the deal more alluring, represented that the land contained an irrigating stream and that a gravel bed nearby would yield sufficient material, free of cost, to make the road leading into this place passable. As a matter of fact, all of the representations were false, and the plaintiffs found themselves with a piece of logged-off land not substantially different from innumerable other tracts in this state which the owners permitted to revert to the tax-levying bodies after the removal of the timber.

The contract which the parties signed recognizes that the plaintiffs were entitled to something more than the bare ground. It refers to the "physical resources" of the property, that is, to the purported timber.

We shall now review a few facts concerning value. Selman testified that he would not have accepted the place even as a gift had he not been deceived into the

belief that timber was growing upon it and that an irrigating stream flowed through it. Charles Franklin, a farmer who had lived in the vicinity of this property for 65 years, and who had logged it off, swore concerning it: "Not much value in any of it now. The principal value was in the timber, but the condition it is in now, it is run down so, that it would take a heck of a lot to get it in a prosperous condition again." After the witness had given a further description he evidently felt the inadequacy of his power of expression, and said: "If it is permissible, I know you haven't got the time, but I would like for you to see that property involved. You could convince yourself in a minute more than we could tell you in a week." The record does not disclose whether this remark was addressed to the presiding judge; nevertheless, the latter stated: "I wouldn't be disposed to go out and look at it without the parties agree to it. But, of course, you could just call it a squirrel ranch. That's about what that is regarded." Franklin acquiesced by saying, "Well, practically so." This tract is a mile off the main highway and the road leading to it is impassable most of the year. When Blakely, in the month of May, tried to drive the defendants to it his car mired in the mud a few feet after it had left the highway, and the parties had to trudge through the mud for about a mile before they reached the tract. Selman testified, "We pack milk out of there on our back, and pack feed up the hill on our back." The tract, according to one witness, is "hill land, ferns, fern land mostly." Two of the corners are covered with second-growth fir which has sprung up among the stumps. The first-growth fir, amounting to 200 cords, is unmerchantable. In one small area the Selmans found an abandoned strawberry patch which

has proved to be non-productive. Another patch consisting of several acres was at one time planted in oats. Upon two sides of the property is a dilapidated fence. The improvements consist of a four-room house, 20 years old, which Franklin, who built it, described as "just a common box house, very common. * * * We just built it as cheap as we possibly could." Selman testified that the roof leaked like a sieve, and Blakely said, "It isn't a house I would care to live in." The barn, 30 by 50 feet in size, was built 46 years ago. It was never painted and has a leaky roof. Shirley acquired the property in 1927 and during his ownership never lived upon it, although in the season of 1931-1932 he permitted it to be occupied by an individual named Hofstetter who sowed several acres in rye grass and planted the strawberry patch; otherwise the property remained unoccupied during Shirley's six-year ownership.

■ It is true that four witnesses, including the defendants Shirley and Blakely, expressed opinions that the property was worth $2,000. Blakely and Shirley were, of course, interested. The other two, C. M. Dollarhide and Martin Lewis, were real estate men. None of the four mentioned the price received for any other tract of land in that vicinity, nor for any other tract of similar kind wherever located. Both Shirley and Lewis mentioned the transfer of a tract somewhere east of this piece, but neither disclosed the consideration it brought. Dollarhide swore that he offered Shirley "a deal" whereby the property would yield him $2,000, but that Shirley told him he had just sold the property to the Selmans. According to Dollarhide, he thereupon went out to this tract and repeated the offer to Mrs. Selman. This answer must be disregarded for two rea-

sons: (a) Mrs. Selman was in California at that time; and (b) the major part of the answer was held inadmissible by the trial judge. Opinions of value which do not mention prices received upon actual sales are not persuasive. A significant fact is the circumstance that Lewis, who swore, "I had it listed for several years" and "I showed the place lots of times," had never been able to find a buyer for it. Another significant circumstance is the fact that although he had owned it since September 6, 1927, and apparently had no use for it, Shirley was not able to dispose of it until the plaintiffs came along. As we have already said, neither of them had any experience upon farms and both were strangers in this state. The wife was a dressmaker and her husband, since the age of 17 years, had been a seaman in the navy. Their visit to the place was wholly insufficient to acquaint them with its features. Then came the false representations. In other words, $2,000 was the market value of the property only when a gullible buyer was found who could be induced to believe that there stood upon the tract 4,000 cords of wood, that it was served with a good stream, and that it was capable of producing crops—crops, mind you, to be planted in June. For all other purposes it was as worthless as the hundreds of thousands of acres of logged-off land which have been forfeited to the state for the non-payment of taxes. The property certainly was not worth $2,000. We repeat the statement that the property certainly was not worth $2,000, and in doing so call attention to the principle stated in *J. C. Corbin Co. v. Preston,* 109 Or. 230, 212 P. 541, 218 P. 917:

"The purchase price agreed upon by the parties, in the absence of other evidence, fixes the value the property would have had if in all material respects, it had been as represented."

*Doyle v. Union Bank & T. Co.*, 102 Mont. 563, 59 P. (2d) 1171, 108 A. L. R. 1047, states the rule thus:

"The price paid for property is generally held to be strong, but not conclusive, evidence of what the value of the property would have been if as represented. 12 R. C. L. 453, Reeser v. Hammond, 122 Kan. 695, 253 P. 233; Divani v. Donovan, 214 Cal. 447, 6 P. (2d) 247."

In *Aitken v. Bjerkvig*, 77 Or. 397, 150 P. 278, Mr. Justice BURNETT quoted approvingly from *Van Velsor v. Seeberger*, 59 Ill. App. 322, as follows:

"It is shown that the representations as set out in the letter were made, and that they were made to influence plaintiff to purchase the house; that he relied upon them; that some of those that were material were untrue. It is plain that there is some damage. The house is not as good as it would be if the representations were true. How much the damage is is not shown, but, under the circumstances, at least nominal damages should have been assessed."

Judge BURNETT continued:

"So in this case, there being evidence tending to show that the plaintiffs were influenced by the untrue statements of the defendants to take the land in question, and that, instead of there being 30 acres of arable land on the premises, there were only 7 or 8, there would be enough testimony to go to the jury on the question of damages."

The fact that the defendants represented that the property was served by a good irrigating stream and held a growth of timber capable of yielding 4,000 cords worth 50 cents per cord, when they asked $2,000 for the property, is an admission that the bare ground, studded with stumps and without a supply of water, was not worth $2,000. The opinion evidence was insufficient to overcome the effect of this admission.

 This is an instance, therefore, in which the proof of fraud is clear; in fact, virtually admitted. But, disregarding value for the time being, we shall consider for a moment the results which will follow if the plaintiffs are entitled to nothing, and if judgment must be entered against them for costs. To make the matter entirely clear, let us assume that the land is worth $2,000 and that we are committed to the out-of-pocket-loss rule which assumes that the proximate result of the vendor's fraud is his receipt of something worth more than that with which he parted. That rule does not concern itself with the fact that the fraudulent statements induced the innocent vendee to expect something which he did not receive. It views proximate result from the contemplations of the cozening vendor at the time he induced the vendee to make the purchase, and in this manner restricts recovery to the out-of-pocket-loss. Therefore, assuming that the land was worth $2,000, (1) the plaintiffs would not be entitled to judgment; (2) the action of ejectment would not be stayed; and (3) the plaintiffs would be evicted from the land. If that result occurs the fraudulent representations will have cost Shirley nothing, and upon regaining possession of the property he will be in a position to repeat the fraudulent representations to another prospective buyer, knowing beforehand that if the truth is discovered the worst that can happen to him is that he will again possess the property. But, in the event that the defrauded buyer pays the purchase price, Shirley will receive $2,000 for the land alone although his representations will have induced the buyer to expect not only land but also timber, a stream and gravel. Thus, the benefit-of-the-bargain principle will operate, but it will operate in reverse—the fraudulent

vendor, and not the innocent victim, will get the benefit of the bargain. Next, if the plaintiffs are awarded no damages we will have virtually remade the contract between the parties, for it is now admitted that for the purchase money the plaintiffs were entitled not merely to the land but also to the wood, etc. Hence, if the law of damages leaves the plaintiffs empty-handed, and they are compelled to pay $2,000 for the land in order to save themselves from eviction, they will receive only a fraction of that which the defendants' written words told them they would receive. Finally, if the contract had followed the preceding negotiations, as it should have done, it would have made some mention of the timber, and in that event the plaintiffs could have maintained an action for breach of contract. In such an instance, as Mr. Justice RAND stated in *Smith v. Pallay*, 130 Or. 282, 279 P. 279, "The law attempts to place the party injured by the breach in the position which he would have been in if the other party had performed as nearly as that is possible by means of a judgment for money." In other words, the plaintiffs would have been entitled to damages for the Shirleys' failure to provide the timber. Are they now to fare worse because they were deceived into a belief that they would receive the timber as well as the land, and therefore neglected to see to it that the contract contained a warranty concerning the timber? If that is true, the defendants have improved their own condition by multiplying their misdeeds, and we have the paradox that it is less culpable—and cheaper too—to commit fraud (always legally and morally wrong) than merely to breach a contract which, although legally wrong, may in instances be morally excusable. But why should more be obtainable in one form of action than in the

other? We abolished the forms of action in order to obviate that absurdity and to make it possible to award adequate relief to the victim of the wrong regardless of the form of the action. Generally, more is obtainable in tort actions than in those based upon a contract (15 Am. Jur., p. 405, § 15) because in the former the damages include everything which was the proximate result of the wrong, including compensation for all injuries which were in the contemplation of the parties at the time the contract was effected, while in the latter the damages are limited to those which were in contemplation when the contract was entered into.

If the above results (those claimed by the defendants) must follow, the law of fraud has dropped to its nadir, and the fraudulent party, rather than his victim, has become its favorite. But the wrongdoer is not the favorite of the law. The primary concern of the law of fraud is not to make the wrongdoer's position safe, and it has not formulated its rule of damages in such a manner that as he plans his course of action he may know beforehand the amount of damages which he will be compelled to pay in the event his deceit is discovered. In fact, the great majority of the cases hold that the law of fraud is not concerned with his contemplations but with those of his victim. The proximate result and the natural consequences of the fraud are determined from the point of view of the victim as he contemplated his purchase.

The defendants, in seeking to ward off the plaintiffs' claim for damages, rely largely upon the reasoning set forth in *Smith v. Bolles*, 132 U. S. 125, 33 L. Ed. 279, 10 S. Ct. 39, and *Sigafus v. Porter*, 179 U. S. 116, 45 L. Ed. 113, 21 S. Ct. 34. In the former, the plaintiff, who claimed that he had been deceived by the

defendant into the purchase of some shares of stock in a gold mining corporation, sought the recovery of damages under the benefit-of-the-bargain rule. In the second case the circumstances were the same except that the subject-matter of the false representation was a gold mine. In each instance, the federal supreme court held that the damages were the out-of-pocket losses. Concerning the first of these two decisions, Professor McCormick, in his treatise on Damages, states in a footnote on page 450:

"Court bases result on view that wrongdoer is liable only for consequences which he might reasonably have contemplated—a proposition dubious in its soundness and in its application."

We concur in that criticism. Because the out-of-pocket-loss rule determines the proximate result from the expectations of the fraudulent vendor rather than those of the innocent vendee, the vast majority of the jurisdictions have refused to embrace that rule; and apparently for the same reason Texas, in 1919, by legislative enactment (Art. 4004 Tex. Rev. Cit. Stat. 1925; 4 Tex. Law Rev. 386) substituted for it the benefit-of-the-bargain rule. The second decision, from which two of the justices dissented, was based largely upon the first. At the times when those two decisions were written the federal courts refused to employ the rule of damages embraced by local practice (McCormick on Damages, p. 450, footnote 10), but since the fall of *Swift v. Tyson*, 16 Pet. 1, 10 L. Ed. 865 (24 A. B. A. Journal 609), the so-called federal common law has disappeared and the federal courts now employ the common law as locally interpreted. The Smith case came from Ohio, and the Sigafus case, which was concerned with a California mine, from the second circuit—Con-

necticut, New York and Vermont. California, Ohio, Connecticut and Vermont employ the benefit-of-the-bargain rule (the cases are collected in McCormick on Damages, p. 451) and New York, after fluctuating for some time between the two rules, stated in the most recent decision of its highest court (*Hotaling v. Leach & Co.*, 247 N. Y. 84, 159 N. E. 870, 57 A. L. R. 1136):

"Varying circumstances must logically require variation in the application of that measure of damages. In Reno v. Bull, supra, we applied that measure of damages in the case of a sale of corporate stock where there were no extraordinary features. We did not hold that other cases might not require a different application of the rule. * * * If we hold that the plaintiff's damages are the difference between the market value of his bond at the time of its purchase and the price paid, we deny him all remedy in an action at law for the deceit. * * * Proximate damages may not be fixed by arbitrary rule."

■ Thus it is almost certain that neither of these cases would employ the out-of-pocket-loss rule were they to be decided by the same court today unless the court believed that the speculative losses which the plaintiffs sought were too conjectural to be recoverable. Therefore, the federal rule which has been the backbone of the out-of-pocket-loss rule is gone. To us, it seems that Judge Cooley's reasoning in *Page v. Wells*, 37 Mich. 415, is more acceptable. He said:

"If the plaintiff was induced to purchase lands on representations which proved to be untrue, the measure of his loss, as it seems to us, would be perfectly plain, and would be reached by an answer to the following question: How much less is the land worth as it is than it would have been if its condition and quality had been as represented?"

All members of the court concurred in that decision and the high standing of the Michigan court at that time entitles the decision to great weight.

*Columbia Door Co. v. Priest,* 128 Or. 359, 274 P. 116; *Greig v. Interstate Investment Co.* 121 Or. 15, 253 P. 877; *Scott v. Wallace,* 102 Or. 22, 201 P. 542; *Parks v. Smith,* 95 Or. 300, 186 P. 552, 554; *Ward v. Jenson,* 87 Or. 314, 170 P. 538; *Salisbury v. Goddard,* 79 Or. 593, 156 P. 261, (all of which are reviewed in our previous decision, and upon which the defendants also rely) arose out of trades. *Hooning v. Henry,* 106 Or. 605, 213 P. 139, was based upon a transaction which was, in part, a trade. The courts have taken note of the fact that in most instances traders place upon their property a trading value and that such values are much higher than cash or sale prices. See *Mueller v. Michels,* 184 Wis. 324, 197 N. W. 201, 199 N. W. 380. The use of inflated values, as is illustrated in *Rockefeller v. Merritt,* 76 Fed. 909, 917, 22 C. C. A. 608, 615, 35 L. R. A. 633, 639, by the language we shall now quote, renders impossible the measurement of damages except under the out-of-pocket-loss rule:

"If A., by the false representation of good title to a lot that is actually worth $1,000, induces B. to give him a lot of the same value in exchange, B.'s damages must be the actual value of the lot which he conveys. If in their contract of exchange of the lots and in their deeds they estimate and recite the value of each lot at five times its actual value, that fact cannot multiply or increase the damages of B. He loses no more than the $1,000, the actual value of the lot he parts with. As long as he accepted A.'s lot in payment for his, he may be permitted to maintain that his lot paid the debt of $5,000 which he incurred to A. for the latter's lot, because that was the contract. But the moment he brings his suit for damages, and thereby undertakes

to collect the value of his lot, or any part of it in money, instead of in land he is limited to its actual market value and to his actual loss.''

Very likely it is on account of the facts to which we have just adverted that Mr. Justice HARRIS, in *Ward v. Jenson,* supra, and Mr. Chief Justice BURNETT, in *Scott v. Wallace,* supra, stated: ''In an action to recover damages for false representations inducing an exchange of property'' the measure of damages is the difference between the market values of the two sets of property. It will be observed that they spoke of ''an exchange''. California, which ordinarily employs the loss-of-the-bargain rule, departs from it when the transaction is a trade. Citing three California decisions, 27 C. J., Fraud, p. 97, § 246, says concerning the law in that state:

''Where there was an exchange as distinguished from a sale, the courts have held the defrauded party entitled to the difference between what he gave and what he got.''

Texas does not seem to employ the same rule in transactions which are trades as in those which are purchases: *White v. Carlton,* 277 S. W. 701.

But the present transaction was not a trade. The contract required the plaintiffs to pay money. *Lichtenthaler v. Clow,* 109 Or. 381, 220 P. 567, *Purdy v. Underwood,* 87 Or. 56, 169 P. 536, and *Cawston v. Sturgis,* 29 Or. 331, 43 P. 656, all of which are reviewed in our previous decision, likewise arose out of the purchase of real property for money. In each of those cases the buyer, in determining whether to make the purchase, contemplated the property, not in the abstract, but as a tract of a given size; and the seller, knowing that fact, represented that it contained the desired area. In each

instance when it developed that the representation was false, the vendor was held liable for damages equal to the value of the missing area. In other words, the buyer was entitled, not merely to a part but to all that he paid for, regardless of whether or not the amount he actually received was worth the sum he paid. In *Lichtenthaler v. Clow*, supra, the representation was that the tract contained 20 acres when, in fact, it consisted of only 16 acres. In *Purdy v. Underwood*, supra, the vendor represented that the tract contained 112½ acres, but, in fact, there were only 78.76 acres in the area. In *Cawston v. Sturgis*, supra, the buyer was induced to purchase an irregular plot under a representation that it contained two and one-half city lots when, in truth, it was no larger than two lots. In each instance the vendor, having made the fraudulent representation, was held liable for the deficiency. This court did not concern itself with the question of whether or not the tract conveyed was worth the sum paid, and yet it would have done so and would have denied recovery in all three cases if we were committed to the out-of-pocket-loss rule, and if the value of the property received equalled the sum paid. In Texas, where the out-of-pocket-loss rule was employed until the legislature substituted for it the benefit-of-the-bargain rule (Art. 4004 Tex. Rev. Civ. Stat. 1925; 4 Tex. Law Rev. 386), the courts held that if the tract received, although less in area than required by the representation, was worth the sum paid, the defrauded buyer was entitled to no damages: *Woodruff v. Conway*, 266 S. W. 868; *Billingsly v. Jefferies*, 255 S. W. 790, and *Vogt v. Smalley*, 210 S. W. 511. But "the theory that the vendee must be satisfied if he got in land the worth of his money is altogether wrong," said *Estes v. Odom*, 91

Ga. 600, 18 S. E. 355, which continued: ''He was entitled to have what he bought and paid for * * * the minimum recovery should be the amount paid for the deficiency * * *.'' The fact which settled the matter in this court was the fact that the proximate result was viewed from the point of view of the innocent buyer's contemplation. The rule is thus stated in *Purdy v. Underwood*, supra:

''When, however, as in the case at bar, a specified sum of money is paid for each integral part of property expected to be received, a failure to transfer a portion thereof at such ratable price, constitutes the measure of damages sustained.''

The situation is the same in the present case. Shirley represented that 4,000 cords of timber, worth 50 cents per cord, stood upon the property. As a matter of fact, only 200 cords were there. Standing trees are, of course, deemed part and parcel of the land. Had he represented that 170 acres were in the tract when actually it consisted of only 160, all would agree that he would be compelled to respond in damages. In the absence of homogeneity of value we would have divided the purchase price by the number of acres and in this manner have ascertained the value per acre. We would then have multiplied the value per acre by the number of missing acres and thus have arrived at the damages. We know that Shirley represented that the stumpage value of the timber was 50 cents per cord, and we also know that he represented that the property held 4,000 cords.

In *Cawston v. Sturgis*, supra, Mr. Chief Justice BEAN said:

''According to the verdict of the jury, the plaintiff paid for and supposed he was buying land *equal in*

*area to two lots and a half,* when in truth and in fact he actually received land *in area equal to a little over two lots;* and, if by the fraud of the defendant, he was deceived and paid for more than he actually received, it seems to us the minimum recovery should be the amount paid for the deficiency, irrespective of the actual value of the true tract. This rule enables a vendee who, relying upon the false and fraudulent representations of his vendor as to the quantity *of land* purchased, pays for *land* he does not receive, to recover in an action for damages the amount of money paid on account of such fraud. It works substantial justice, and is amply supported by authority.''

In the above quotation we use italics in four places. Let us now re-read the quotation and make the following substitutions: For the first group of italicized words, substitute ''and 4,000 cords of wood''; for the second, substitute the word ''only''; for the third group, make no substitution and read with the space vacant; and for the fourth, being the word ''land'', substitute the word ''something''. Thus, we have made no change in substance and no change requiring the application of a different legal principle. The only change has been one of items—for a missing half lot we substituted 4,000 cords of missing timber. In the one instance the buyer was as badly deceived as in the other, and in each instance he was substantially damaged. As was said in *Griffin v. Fairmont Coal Co.,* 59 W. Va. 480, 53 S. E. 24, 2 L. R. A. (N. S.) 1115:

''A person who owns the entire estate may sell and convey any part of it. It may be divided horizontally, perpendicularly or in any manner according to the will of the owner.''

In the present case the parties divided the property ''perpendicularly'' in fixing its price and the plaintiffs received only the part up to the surface. Every demand

of the above three precedents is present, and they constitute a sufficient reason for awarding damages.

Suppose the defendants had conveyed to the plaintiffs the timber only, all would agree that damages equal in amount to the value of the land would be recoverable. The reverse must be true, and since the plaintiffs received only the land they must be entitled to damages equal to the value of the timber.

█ We shall now show by the decisions of the other courts that the mere fact that the missing item is not land but is something else, does not deny relief to the plaintiffs. In *Nunn v. Howard*, 216 Ky. 685, 288 S. W. 678, the plaintiff had sold to the defendant a house and lot, falsely representing in so doing that an unfailing well was upon the premises. The defendant spent $158 in providing a well of the represented kind. The decision, after stating these facts, continued:

"That being true, it follows that appellee is liable in damages for the representations so made. McGuffin v. Smith, 215 Ky. 606, 286 S. W. 884. And in the circumstances, the most accurate measure of damages is the reasonable cost of drilling the well. It follows that the item of $158 should have been allowed."

In *Okoomian v. Brandt*, 101 Conn. 427, 126 Atl. 332, the defendant, who had sold the plaintiff an improved lot under a false representation that the three tenants were each paying $35 per month rental, was held liable in the amount of $325.50 damages, that being the sum which the plaintiff expended in the installation of permanent electrical equipment in order to bring the income of the property up to the represented amount. In *Shane v. Jacobson*, 136 Minn. 386, 162 N. W. 472, the plaintiff had been induced to buy a farm under a false representation that 80 acres of it was tiled. The Minne-

sota court adheres to the out-of-pocket-loss rule as it indicated in the decision under review by its following language:

"We have held, in conformity with the rule in the federal courts, that the measure of this loss is the difference between the money or the value of the property which the defrauded party was induced to part with and that which he received in the transaction."

In measuring the plaintiff's damages under that rule, the court held that the plaintiff was entitled to recover the cost of installing the tiling, together with the rental value of the land while the work was in progress. We quote from the decision the following:

"In other words, the damages in contemplation of the parties as naturally flowing from a misrepresentation in respect to this tiling would be the cost thereof, to which, perhaps, should be added the depreciation of rental value of the land affected while the tiling was being done. The rule is that a defrauded party is entitled to such damages as naturally and proximately result from the fraud. * * * Suppose in this case that plaintiff had bought the farm when he met defendant in Iowa, without seeing it, upon defendant's representations as to soil, lay of the land and improvements, and all the representations had been true except that a granary of certain dimensions and material, represented to be one of the buildings, was not there, a structure which could be erected for, say $200; could it be justly claimed that the natural and proximate loss to plaintiff for this one false representation could then have been more than the cost of placing such a granary as represented upon the farm? * * * Therefore the actual cost of placing tiling thereon, and the extent to which such improvement would increase the value of the farm, was proper and very material evidence bearing upon the amount of recovery, and without which an intelligent answer could not be given as to the natural and proximate loss to plaintiff."

From all of the above it is seen, not only that the plaintiffs were damaged, for convincing evidence shows that the property is worth less than $2,000, but that we have an approved means of measuring the damages, which are the proximate result of the false statements made by the defendants. If the latter had represented that there was upon the property a pile of wood containing 4,000 cords, the damages to which the plaintiffs would have been entitled would have been the value of that amount of wood. The same result ought to follow when, as in this case, the defendants represented that there was standing timber upon the property capable of yielding 4,000 cords worth 50 cents per cord upon the stump. This method of measuring the damages is the same as was used in the Kentucky, Connecticut and Minnesota cases just reviewed, and is no different from that employed by us in the Lichtenthaler, Purdy and Cawston decisions.

In *Page v. Wells*, supra, the court indicated that the value of real property purchased as a tract cannot be determined by showing the value of each of its individual units—the timber, the clay deposits, the gravel beds—and the value of what will be left after all of these resources have been removed. But in that case the defendant was not a vendor and he had made no representation as to the value of the individual units. In *Riley v. Atmar*, 213 S. W. 682 (Tex. Civ. App.), the defrauded vendee, who was entitled to both land and timber, recovered the value of the timber. However, the Shirleys have not asked that the value of the timber be separately determined; nor have they sought to show what the value of the property would have been had the representations been true. They do not claim that the timber would have been worth less than 50

cents per cord had their representation concerning its existence been true. Therefore, to employ as a means of determining the plaintiffs' damages the value of the missing timber is the use of a method supported by authority.

To hold that the damages can be measured in this manner and that an award is recoverable is not at variance with any of our previous decisions. We certainly have no thought of overruling any of them, and state expressly that we believe each of them was correctly decided, although some of the language employed by them, which can be readily identified as dictum, went further than was necessary.

Of course, if one adheres rigorously to the out-of-pocket-loss rule or to the benefit-of-the-bargain rule certainty will be achieved, but it will be achieved in many instances at the expense of justice.

■■ In our previous decision we cited authorities indicating that neither rule has been uniformly applied, and in preceding paragraphs of this decision have amplified them. We know of no difficulty which has resulted from flexibility. An examination of the decisions in the states employing flexibility discloses that they are not large in number, nor do they afford any indication that flexibility has created uncertainty. It is inevitable that ordinarily only out-of-pocket losses will be recoverable, for ordinarily that is the only loss which is incurred or which can be proved with sufficient certainty. Consequential damages are universally recoverable. If the representation can be made good by the expenditure of a sum less than that which is the difference between the actual value and the represented value, the cost of the installation is the sum which is recoverable. Professor McCormick recommends that

the loss-of-the-bargain rule should also be employed where a false representation was made with moral culpability, as distinguished from one made by a person who is ignorant of the facts. But since punitive damages are recoverable in this state, there exists no occasion for a departure from the out-of-pocket-loss rule in cases of that kind. For all of the above we depend much upon *Lichtenthaler v. Clow*, supra, which is the decision by this court which bestowed the most extensive consideration upon the subject, and which expressly recognized that the subdivisions of the proximate result rule—(a) out-of-pocket loss, and (b) benefit-of-the-bargain—are employed in a flexible manner.

Since the petition for a rehearing has disclosed no error in our previous decision, we adhere to that opinion.

To avoid misunderstandings, we repeat that Blakely was not a party to this appeal.

RAND, C. J., KELLY and BEAN, JJ., concur.

---

BELT, J. (dissenting). On July 1, 1933, S. W. Selman and his wife Nona entered into a written contract to purchase for $2,000 a 160-acre ranch in Benton county, Oregon, from H. E. Shirley and his wife. Payments were to be made in the following manner: $500 upon execution of the contract; $200 on or before October 1, 1934, and a like sum of $200 on or before the 1st day of October annually thereafter until the full purchase price was paid. Selman and his wife paid $550 upon execution of the contract, took possession of the premises and have retained the same ever since. $200 was paid on October 1, 1934, but the Selmans failed to

make the annual payment due on October 1, 1935. On October 22, 1935, the Shirleys commenced an action in ejectment.

Soon after the action in ejectment was commenced, the Selmans instituted the instant suit in equity to reform the description of the land purchased and to recover damages for fraud and deceit alleged to have been practiced upon them in the transaction. It is conceded that a mutual mistake was made in the description of the land and this was corrected by the decree of the lower court. Issue was joined on the allegations of fraud and the damages sustained.

Plaintiffs, in their amended complaint, charge that they were induced to buy the 160-acre tract of land on account of the following representations:

(1) "* * * That said premises had growing thereon at least Four Thousand (4000) cords of merchantable fire wood;

(2) "that there was sufficient water in the stream running through said premises to irrigate at least ten acres of land thereon in the driest season of the year; * * * and,

(3) "that there was available, adjacent to the road leading to said premises from the Philomath-Alsea Highway, sufficient gravel to gravel said road and that said gravel could be had for the hauling, that said gravel belonged to Benton County, Oregon."

Plaintiffs allege that the above representations were false and fraudulent in that:

(1) "* * * in truth and in fact there was no merchantable fire wood growing upon said premises;

(2) "that there was not sufficient water to irrigate ten acres or any other amount in excess of One-Eighth of an acre; and * * *,

(3) "that the gravel * * * was privately owned and was not available for graveling said road * * *."

Plaintiffs inspected the premises before entering into the contract of purchase, but assert that they were strangers in Benton county and "had no knowledge or experience in judging timber or timber lands" and that they relied wholly upon the representations made to them. On trial they testified that on account of rain and the muddy ground they were unable to inspect the timber.

The trial court entered findings of fact:

### III.

"* * * * *plaintiffs herein made their own examination of said premises together with defendant C. G. Blakely and had the same opportunity as defendant C. G. Blakely to examine said premises and ascertain from such examination the condition thereof and the facts relative thereto*; that defendant C. G. Blakely did not knowingly make any false representation to plaintiffs and was not consciously ignorant or recklessly indifferent to the truth or falsity of any representation made by him to plaintiffs as aforesaid. (Italics ours.)

### IV.

"That the defendant H. E. Shirley knowingly and falsely represented to plaintiff that there was at least four thousand cords of wood on said premises; that said representation was false and was made by defendant H. E. Shirley with the intention of inducing plaintiffs to purchase said premises; that the plaintiffs in purchasing said premises relied upon said representation.

### V.

"That said premises so purchased by plaintiffs from defendants H. E. Shirley and Ruth Shirley were of the fair market value of $2000.00 at the time said contract was entered into, to-wit, July 1, 1933; that plaintiffs

have suffered no damage, having agreed to pay $2000.00 for said premises. * * * *''

The decree reformed the written contract as alleged in the amended complaint but dismissed the suit against the defendants based on the charge of fraud. From this decree, the plaintiffs appealed.

On original hearing (85 P. (2d) 384) the court held, with the writer dissenting, that plaintiffs had been defrauded and were entitled to damages ''upon the basis of 50 cents per cord for the difference between the represented 4,000 cords and the actual 200 cords,'' which amounted to $1,900. There was a balance of $1,250, together with interest due, on the purchase price, as $750 had been paid thereon. Therefore, this court's decree enabled plaintiffs to acquire this 160-acre ranch for $100. In reaching this conclusion, the majority of the court held that plaintiffs were entitled to the ''benefit of the bargain'' rule asserted by defendants. Had the ''benefit of the bargain'' rule been also applied so as to compensate plaintiffs for the failure of water to irrigate the 10-acre tract and the loss of gravel, we would have the anomalous situation of the vendors being deprived of their property without compensation and being mulcted in damages besides.

In the lower court, evidence was received on behalf of the defendant vendors that, at the time the contract was entered into, the land had a market value of $2,000. Since the contract price, or $2,000, was the market value of the land, the defendants contend that no damages are recoverable in an action of this kind. Plaintiffs introduced no evidence concerning the market value of the land. It was their contention that the ''out of pocket'' rule had no application to the facts and they

relied on the benefit of their bargain in the assessment of damages.

It should be borne in mind that there was no misrepresentation concerning the quantity of land or the boundaries thereof. It is not a case of shortage in acreage as in *Lichtenthaler v. Clow*, 109 Or. 381, 220 P. 567; *Purdy v. Underwood*, 87 Or. 56, 169 P. 536, and *Cawston v. Sturgis*, 29 Or. 331, 43 P. 656. The issue on this appeal is clearly and definitely defined. What is the proper measure of damages to be applied to the facts in this case? Are plaintiffs entitled to the benefit of their bargain, namely, the difference between the value of 4,000 cords of wood and 200 cords of wood? Or is the proper measure the difference between the contract price of the land and its market value? As stated by Mr. Justice ROSSMAN, speaking for the court on original hearing:

"The sole issue upon which we deem it necessary to express an opinion is whether the plaintiffs are entitled to (1) the benefits of their bargain; or (2) no damages because the market value of the land equals the sum which they agreed to pay."

It seems highly important that this question be determined clearly and definitely so that members of the bar and trial courts may know how to proceed. If there is any one thing that is devoutly to be desired it is certainty of the law. Distinctions based upon immaterial differences in factual situations tend only towards confusion and uncertainty.

What is the proper measure of damages in tort actions wherein fraud has induced the sale or exchange of property? This has long been a controversial question among judges, lawyers, professors, and text writers. As stated in a well-considered article entitled

"The Measure of Damages in Tort for Deceit," 18 Boston U. L. Rev. 681:

"Upon this subject American courts are divided; textwriters present a broken front; a left wing wars with a right; academicians cannot agree; the Law Institute advisers dissent from the reporters; precedent neutralizes precedent; abstract reasoning carries no persuasion; arguments have no other effect than to engender counter-arguments; one practical consideration clashes with another practical consideration; nothing is settled as the just law or general rule."

The majority of the state courts hold that the measure of damages in actions upon sales induced by fraudulent representations is the difference between the actual value at the time of the sale and what would have been worth as represented: *George v. Hesse,* 100 Tex. 44, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep. 772, 15 Ann. Cas. 456; 27 R. C. L. 382; 27 C. J. 97; Annotations 108 A. L. R. 1060 and 57 A. L. R. 1142. The English courts (*Peek v. Derry,* 37 Ch. D. 541); the federal courts (*Smith v. Bolles,* 132 U. S. 125, 10 S. Ct. 39, 33 L. Ed. 279; *Sigafus v. Porter,* 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113) and numerous state courts, in cases of sale, limit the recovery to the difference between the price paid and the market value.

No well-considered case holds that a hard and fast rule should be applied in all cases. Objections have been made to both rules. However, the American Law Institute, after a thorough consideration of the subject, reached the conclusion that the better-reasoned cases support the "out of pocket" rule. Hence, we find in the Restatement of the Law on Torts, § 549:

"The measure of damages which the recipient of a fraudulent misrepresentation is entitled to recover from its maker as damages under the rule stated in § 525

is the pecuniary loss which results from the falsity of the matter represented, including * * *."

The "comment" in reference to the above clause is so clear-cut and pertinent to the facts in this case that we quote it in full:

"Under the rule stated in this Clause the recipient of a fraudulent misrepresentation is entitled to recover from its maker only the actual loss which because of its falsity he sustains by his action or inaction in reliance upon it. If notwithstanding the falsity of the representation the thing which a vendee acquires is of equal or greater value than the price paid and he has suffered no harm through using it in reliance upon its being as represented, he has suffered no loss and can recover nothing. The fact that he would have made a profit if the representation had been true does not entitle him to recover for his disappointment in not receiving the gain which he was led to expect. Thus where A induces B to purchase a parcel of farm land by falsely representing that it contains valuable mineral deposits, B is not entitled to recover anything if the land as farming land is worth as much as the price paid although had it contained the minerals represented it would have been worth much more. If the fraudulent misrepresentation is so made as to constitute a warranty, the person acting in reliance upon it may of course waive the fraud and bring an action on the warranty, in which case the measure of damages is that appropriate to a warranty, namely, the difference between the value of the article as it is and the value which it would have had had the fact warranted been true."

It is observed that, in the above restatement of the law, no distinction is made between sales and exchanges of property in fraudulent transactions, so far as the measure of damages is concerned. In case of a sale, the party defrauded parts with his money; in exchange of

land, the defrauded party parts with his property. The legal principles involved are the same. The rule in jurisdictions maintaining the "out of pocket" rule is thus stated in 27 C. J., p. 96:

"In such jurisdictions the defrauded purchaser is limited to the difference between the real value of the property purchased and the price paid, or in case of an exchange, the difference between the value of what the injured party was fraudulently induced to part with and the value of what he got."

Among other authorities cited are *Ward v. Jenson,* 87 Or. 314, 170 P. 538; *Purdy v. Underwood,* supra; *Robertson v. Frey,* 72 Or. 599, 144 P. 128.

The above "comment" of the American Law Institute closely follows the reasoning of the United States court in *Smith v. Bolles,* supra, which involved a fraudulent sale of stock in a mining company. The court said:

"The measure of damages was not the difference between the contract price and the reasonable market value if the property had been as represented to be, even if the stock had been worth the price paid for it; nor if the stock were worthless, could the plaintiff have recovered the value it would have had if the property had been equal to the representations. What the plaintiff might have gained is not the question, but what he had lost by being deceived into the purchase. *The suit was not brought for breach of contract.* The gist of the action was that the plaintiff was fraudulently induced by the defendant to purchase stock upon the faith of certain false and fraudulent representations, and so as to the other persons on whose claims the plaintiff sought to recover. If the jury believed from the evidence that the defendant was guilty of the fraudulent and false representations alleged, and that the purchase of stock had been made in reliance thereon, then the defendant was liable to respond in such dam-

ages as naturally and proximately resulted from the fraud. He was bound to make good the loss sustained, such as the moneys the plaintiff had paid out and interest, and any other outlay legitimately attributable to defendant's fraudulent conduct; but this liability did not include the expected fruits of an unrealized speculation." (Italics ours.)

Sedgwick in his able work on Damages (9th Ed.), § 1027, recognizes that the numerical weight of authority supports the contention of the appellants herein, but it is nevertheless the conclusion of the author that the "out of pocket" rule is based on logic and reason. Thus Sedgwick speaks (Sedgwick on Damages, § 781):

"Instead of finding positive reasons for departing from the logical measure of damages in an action of tort, therefore, the reasons both theoretical and practical seem to support the Smith v. Bolles doctrine. The defrauded vendee has, accordingly, three alternative remedies: *first,* rescission and recovery of the consideration; *second,* an action for deceit and recovery for his actual loss, i. e., the difference between the value of what he parts with and of what he receives; *third,* an action for breach of any warranty contained in the contract of purchase and recovery of the difference in values between the property as received and the value as warranted."

In *Rockefeller v. Merritt,* 76 F. 909, 22 C. C. A. 608, 40 U. S. App. 666, 35 L. R. A. 633, that eminent jurist, Judge Sanborn, well stated the rule applicable to the facts in this case:

"The true measure of damages suffered by one who is fraudulently induced to make a contract of sale, purchase or exchange of property is the difference between the actual value of that which he parts with and the actual value of that which he received under the contract. It is the loss which he has sustained, and not the profits which he might have made by the transaction."

New York for many years consistently adhered to the so-called majority rule but, since 1919, the court has apparently been convinced of the error of its ways and is now, in cases of this character, committed to the "out of pocket" rule. See *Reno v. Bull*, 226 N. Y. 546, 124 N. E. 144, citing with approval *Smith v. Bolles*, supra, and *Sigafus v. Porter*, supra.

Whatever may be the rule in other jurisdictions, it has long been settled in this state that, in tort actions for fraud inducing the sale or exchange of real property, the measure of damages is the difference between the value of the property parted with and the actual value of the property received. This court has never endeavored to treat a tort action as being equivalent to a breach of contract. It has adhered to the fundamental principles of tort. The party defrauded is entitled to be made whole—i. e., he is not to be out of pocket. The damages should equal only the loss which the fraud or deceit inflicted upon him. If there has been no loss there can be no recovery, although fraud has been practiced. It is a simple standard, reasonably definite and easily understood. We do not intimate that any hard and fast rule in measuring damages can be applied to every factual situation wherein fraud and deceit are involved. The measure of damages depends somewhat upon the kind and character of the misrepresentation. It can be said, however, with certainty that the "benefit of the bargain" rule, i. e., the difference between the value of the property parted with and the value of the property as represented, has never been applied to a tort action of this character.

Plaintiffs had their opportunity to introduce evidence relative to the market value of the land purchased, but they failed to do so. What they really

sought was damages arising from breach of contract. The fallacy of such contention lies in the fact that the vendors did not contract to sell, nor did the plaintiffs agree to buy, 4,000 cords of wood. Plaintiffs, under the terms of the contract, agreed to buy a 160-acre farm. Applying the "benefit of the bargain" rule to the facts in the instant case leads to absurdity for it amounts to the vendees acquiring the land for practically nothing.

*Columbia Riv. Door Co. v. Priest*, 128 Or. 359, 274 P. 116, is squarely in point and is adverse to appellants. In that case the plaintiffs brought an action to recover damages on account of fraudulent representations inducing the exchange of lands. The alleged false representations pertained to the quantity of timber upon each of the two tracts of land. The land had less than one-half the amount of timber represented. The court said:

"If defendant's contention be true that plaintiff was not damaged in this exchange of property, even though false representations were made, that, of course, would preclude a recovery by plaintiff."

Now what difference in principle is there between the instant case and the one above mentioned? Can it be that a different rule applies where a sale and not an exchange of property is involved? If so, what is the· ground for such distinction?

*Southern Oregon Orchard v. Bakke*, 106 Or. 20, 210 P. 858, was an action to recover the balance of the purchase price of a tract of land. The defendant filed a counter claim for damages arising out of alleged false representations concerning the quality of the land. The trial court instructed the jury that the measure of damages "would be the difference between what

the defendant paid for the property and its fair market value at the time of entering into the contract." On appeal, this court, speaking through Mr. Justice Mc-Bride, held that "this charge clearly states the law". This case involved a sale and not an exchange of property. Chief Justice Burnett and Justices Harris and Rand concurred in the decision.

*Salisbury v. Goddard,* 79 Or. 593, 156 P. 261, involved fraudulent representations inducing the exchange of a rooming house for land. In speaking of the measure of damages, the court said:

"If, therefore, the plaintiffs received property of equal value of the lot which they conveyed, and the money they paid, they were not injured and sustained no damages." Citing *Van de Wiele v. Garbade,* 60 Or. 585, 120 P. 752; *Robertson v. Frey,* 72 Or. 599, 144 P. 128.

*Ward v. Jenson,* supra, was an action for damages involving fraud in the exchange of lands. In the complaint the plaintiff alleged that the defendant had made the following false representations for the purpose of inducing her to exchange property in Portland for certain land in California: (1) That he had invested $10,000 in the California property; (2) that it had cost him $6,000 to level the land so that it could be irrigated, to buy and set out orange trees and to install a water pipe line; (3) that the pumping plant on the premises was of sufficient capacity to supply water for irrigating all the property; (4) that from three to six hours was sufficient time for the irrigation of all the tracts; (5) that he owned the ten-acre tract; (6) that the whole property was of the value of $18,000; (7) that he had a mortgage to secure the loan of $8,000 on the ten-acre tract and that plaintiff could judge of the value of that tract by the fact that there was a mortgage on it to

secure a loan of $8,000; and (8) that the Orange county property contained 15 acres. The trial court instructed the jury as follows:

"The measure of damages in this case is the difference between the value of the land as it would have been if it was as represented, and the actual market value; in other words: the value which Mr. Jenson represented was the true value and its actual value, which you find is the market value."

This court, speaking through Mr. Justice HARRIS, said:

"This instruction was erroneous. It is settled in this state that in an action to recover damages for false representations inducing an exchange of property the measure of damages is the difference between the market value of the property parted with by the person defrauded and the market value of the property received by him." Citing numerous authorities in support thereof, among which are Smith v. Boles, supra, and Sigafus v. Porter, supra, by the United States Supreme Court.

In *Parks v. Smith*, 95 Or. 300, 186 P. 552, 554, it was alleged that fraud induced the exchange of real property. It was charged that:

"In order to persuade and induce these defendants to make said trade and exchange, the said plaintiffs represented and stated to these defendants that the property of said plaintiffs, being the above-described property, was located only five and one-half miles from Mapleton, in Lane County, Oregon, by wagon road, and only three and one-half miles by section line; that all of said land was level and tillable except two acres; that there were on said land no big trees except twenty or thirty dead fir or cedar trees; that the river crossed said land at only one place, and that being directly across one forty; that all of said land was low bench or bottom land; that the public highway skirted the said premises, and that said land was of the reasonable value of $6,000.

"* * * that the said Lane County land is ten miles from Mapleton, that there are not to exceed 50 or 60 acres of said land which is level, that the remainder is rough, hilly, precipitous, some of which is inaccessible by reason of its steep and precipitous nature; that practically the whole of said land is heavily timbered with large dead trees, mostly fallen, a part of which timber is what is described as an 'old burn'; that the public highway which is 60 feet in width traversed said land in a zigzag manner; that the river enters and crosses said land at three different points, making thereby much of said land valueless."

Defendants also alleged that the premises were worth not to exceed $1,200.

The court, speaking through Mr. Justice Bean, held that:

"Defendants cannot recover damages for misrepresentation in effecting an exchange of property, if they received property of equal or greater value." Citing Ward v. Jenson, supra; Salisbury v. Goddard, supra.

*Scott v. Wallace,* 102 Or. 22, 201 P. 542, involved the *sale* of 150.04 acres of land in Lane county. It was charged that plaintiffs fraudulently represented: (1) That there were 90 acres of land under cultivation whereas there were in fact only 65 acres; (2) that there were 70 acres of growing wheat thereon, when the area was only 37.37 acres; (3) that there was no rock on the land except three piles of loose rock on cultivated land, whereas the land under cultivation was full of rock, both loose and in boulders and ledges. It was held that the proper measure of damages was, as stated in *Ward v. Jenson,* supra. After quoting from the above decision, the court, through Mr. Justice Burnett, said:

"With these rules of law established, as they are, by a long list of precedents, the question resolves itself

into one of fact, whether or not the defendants have been damaged. The query is, whether their alleged damage, when tested by the standard of Ward v. Jenson, supra, amounts to something or nothing."

Also, to the same effect, see: *Hooning v. Henry*, 106 Or. 605, 213 P. 139; *Van de Wiele v. Barbade*, supra; *Zobrist v. Estes*, 65 Or. 573, 133 P. 644; *Greig v. Interstate Investment Co.*, 121 Or. 15, 253 P. 877; *Howard v. Merrick*, 145 Or. 573, 27 P. (2d) 891. That this court has committed itself to the "out of pocket" rule as a proper measure of damages applicable to the facts in the instant case is universally recognized. See McCormick on Damages, § 121; 27 C. J. 96; Annotations 108 A. L. R. 1062 and 57 A. L. R. 1146.

Plaintiffs rely strongly upon *Lichtenthaler v. Clow*, supra, but, in our opinion, it does not support their contention that the "benefit of the bargain" rule should be applied to the facts in the instant case. In that case Lichtenthaler purchased certain "lands and premises" for a lump sum of $6,000. The plaintiff therein charged that the defendants falsely and fraudulently represented that there were 20 acres within the area described in the conveyance whereas, in truth and in fact, there were but 14 acres. There were certain buildings and other improvements on the land but it appears from a statement of the facts of the case that such were on that part of the land actually received by plaintiff. The value of the four acres—the deficiency found by the jury—was the sole matter at issue. The trial court gave the following instruction:

"I instruct you if you find that the plaintiff is entitled to recover, the measure of damages would be such proportion of the purchase price, which in this case would be six thousand dollars, as the deficiency bears

to the represented area. In other words, the measure of damages is the amount paid for the deficiency, irrespective of the real value of the tract actually conveyed.''

On appeal it was held that the above instruction was erroneous in that it was not the proper measure of damages to be applied to the facts in the case. The court rejected the proportional rule as applied to a case where valuable improvements were on land which had been purchased for a gross price. It approved the rule announced in *Hoback v. Kilgores*, 26 Gratt. (Va.) 442, 21 Am. Rep. 317, namely, that the vendee was entitled to such portion of the purchase price, less the value of the improvements, as the deficiency bears to the area described in the contract. The court commented on cases dealing with misrepresentations concerning quantity, condition and value of land and stated that they were ''divided into two classes: (1) those which measure the damages by ascertaining the difference between the actual value of the property received and its value if it had been as represented to be; and (2) those which measure the damages by ascertaining the difference between the actual value of the property and the amount paid for it.'' Under the second classification, the court cited numerous authorities from this jurisdiction, leaving no doubt as to the classification in which this state belongs. We also note the following highly significant statement made by Mr. Justice HARRIS in the Lichtenthaler case:

''Compensation is the end which the law strives to attain, and consequently damages must be compensatory and not speculative. Any rule submitted for the measurement of damages is to be commanded only to the extent that it accomplishes the object of the law. The defrauded party is entitled to be made whole, if

that result can be accomplished but he is not entitled to more: Rainier v. Masters, 79 Or. 534, 539 (154 Pac. 426, 155 Pac. 1197, L. R. A. 1916E 1175)."

In view of the issues involved in the Lichtenthaler case, we are at a loss to understand how it can reasonably be contended that it supports the "benefit of the bargain" rule. The most that can be said is that, under the particular state of facts, it was necessary for the court, in order to enable the defrauded party to be made whole, to depart from the general rule in the measurement of damages.

The following cases are also relied upon as supporting the "benefit of the bargain" rule: *Robertson v. Frey*, supra; *Purdy v. Underwood*, supra; *Cawston v. Sturgis*, supra.

*Robertson v. Frey*, supra, does not support the "benefit of the bargain" rule. The instruction of the trial court embodying such rule was not approved on appeal. The judgment was affirmed by virtue of Art. VII, § 3 of the Oregon Constitution, "* * * notwithstanding any error that may have been committed during the trial."

In *Purdy v. Underwood*, supra, land was purchased at a certain price per acre, but there was a deficiency in the amount of land. Under this factual situation—wholly at variance with the one under consideration in the instant case—the court, in order to make the defrauded party whole, allowed damages for the deficiency in land at the ratable price per acre.

*Cawston v. Sturgis*, supra, is in the same category as it involved a deficiency in the land purchased.

It must be apparent that a different measure of damages applies when the fraud is based upon misrepresentations concerning the quantity of land purchased

or exchanged. These cases, however, have no application to the facts in the instant case, as no shortage of land is involved herein. Certainly they do not support the "benefit of the bargain" rule.

What has been said thus far is on the assumption that the misrepresentations were made as alleged and that plaintiffs relied thereon, although it is difficult to understand how anyone, after inspection, could have been deceived about logged-off land. It would seem that the black stumps would speak for themselves. It is also difficult to understand why the Selmans continued to make payments after learning, in August, 1933, of the shortage of wood and their alleged consequent damages. In reference to that phase of the case, consider the testimony of Mr. Selman (Trans. 91, 92):

"Q. And when you came up here on the 13th of October and made that payment you only owed a balance of 1450 before you made that payment? A. Yes, sir.

"Q. And you knew at that time you had been damaged eighteen hundred dollars and only owed 1450? A. According to the circumstances we were damaged that much.

"Q. Yes, and you knew it at that time? A. Yes, sir.

"Q. And had known it for quite a while before? A. Yes, sir.

"Q. In other words the damage amounted to 350 more than what you owed Mr. Shirley at that time? A. Yes, sir.

"Q. Then why did you pay him two hundred dollars and interest on it? A. We paid Mr. Shirley two hundred dollars because he agreed to do what was right.

"Q. Did you have him express himself as to what he thought was right? A. He did not. We didn't ask him what. We thought that he would be reasonable.

"Q. You though at that time naturally expected him to make this eighteen hundred dollars good, didn't you, for the thirty-six hundred cords? A. We expected him to make a reasonable settlement on the place. We didn't expect him to give us eighteen hundred dollars outright.

"Q. You expected him to make the place though worth as much as to you as it would have been worth if it had been as represented? In other words, make good the representation? A. We expected him to make good the misrepresentation.

"Q. And that could only have been done by paying you eighteen hundred dollars for this shortage of wood? A. Well, we couldn't hardly expect him to give us eighteen hundred dollars.

"Q. Why? A. Well, it wouldn't have been fair in the first place.

"Q. Wouldn't have been fair? A. I hardly think it would.

"Q. You are asking two thousand dollars now, aren't you, as damages? A. We are.

"Q. Do you think that's fair then if eighteen hundred dollars wouldn't have been fair at that time? The four thousand cords is two thousand dollars, isn't it? A. We were not dealt with square to begin with."

On September 16, 1934, Mrs. Selman wrote from California to Mr. Shirley concerning an arrangement to settle on a cash basis for the amount due on the purchase price. The letter was entirely friendly and made no reference to any alleged false representations, although at such time the Selmans were fully aware of conditions on the farm which they had purchased. Concerning this letter, the record (Trans. 69) thus speaks:

"Q. Why didn't you tell him in that letter you had been damaged two thousand dollars and two thousand dollars was all you were paying for the place and therefore he owed you your money back, all that you had paid him? * * * A. I just got through telling you. Because I wanted to tell him to his face.

"Q. How? A. I wanted to tell him to his face the damage we had been done and not in a letter.

"Q. That's the only explanation you care to make of that? A. That's all I know how to make. I don't know just how else you would put it."

The equities of the case are not entirely with the plaintiffs. They have been in possession of 160 acres of land since August, 1933, and it has been their home, however humble it may be. They have paid $750, together with interest, on the purchase price. This farm or hill ranch had, according to Shirley, a rental value of $150 per year. It is utterly unreasonable to state that it is worth only $100. Yet that is what this court must say if we adhere to the decision on original hearing. Can it be that the testimony of all witnesses on market value is to be ignored? Mr. Dollarhide, a disinterested and fair witness, testified without contradiction that he offered Shirley $2,000 in cash for the ranch, but learned that it had just been sold to the plaintiffs. Dollarhide thereupon went out to see Mrs. Selman, "to see if she would sell it", but she would not do so. Dollarhide and three other witnesses testified that the market value of the 160-acre ranch was .$2,000. Otherwise stated, that it was worth $12.50 per acre.

This farm is not all logged-off land. 40 acres are assessed as tillable land. It is a typical hill ranch, valuable mostly for pasturage purposes. Blakely, a witness friendly to plaintiffs, said that, at the time of inspecting the ranch, nothing was said about wood or timber. The plaintiffs, according to this witness, wanted a place off the main highway and out of traffic.

However, let it be understood that this opinion is bottomed on the legal proposition that the "benefit

of the bargain'' rule does not apply to the facts in this case. We have adverted to these features of the case only to refute the idea of a gross miscarriage of justice in the event the decree of the lower court is sustained.

In the light of all that has been said by this court relative to the proper measure of damages to be applied in actions of this kind, the trial court, no doubt, felt secure in denying plaintiffs any relief, for the simple reason that they had sustained no loss. In other words, under the uncontradicted evidence, the land which they purchased had a market value equal to the price which they agreed to pay for it.

The decree of the lower court should, therefore, be affirmed.

LUSK and BAILEY, JJ., concur in this dissenting opinion.