**EQUITABLE LIFE & CASUALTY INSURANCE CO., Appellant,**

**v.**

**Virgil N. LEE, Appellee.**

**EQUITABLE LIFE & CASUALTY INSURANCE CO., Appellant,**

**v.**

**Margaret L. PAGETT, Appellee.**

**Nos. 17031, 17038.**

United States Court of Appeals Ninth Circuit.

Nov. 14, 1962.

Buss & Pihl, Donald A. Buss, Hollie Pihl, Kent Holman, and Arthur Nielson, Portland, Or., for appellant.

Weiser, Bowles & Young, and Rollin E. Bowles, Portland, Or., for appellee.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

Defendant appeals from the two judgments of the United States District Court for the District of Oregon. Both are diversity cases involving fraud in the sale of insurance policies. Plaintiff Lee asked for the sum of $3,000 general damages, and the sum of $10,000 punitive damages. Plaintiff Pagett sought $1500 general damages, and $10,000 punitive damages. The Court, sitting as finder of the facts, resolved the issues in plaintiffs' favor and allowed each of them substantial punitive damages in addition to general damages. The facts of these cases, as well as the questions of law, are substantially the same and therefore they will be discussed together.

We have examined all of the defendant's contentions, find none of them sound, hence we affirm both judgments of the District Court.

Plaintiff Lee was first contacted by defendant's sales agent, Leo Rognlie, late in 1955 or early in 1956. Dr. Lee testified that during the next few weeks he was also contacted by O. R. Myers, a sales agent of defendant, and Walter A. Reklau, General Sales Manager for the Portland office of the defendant. During the course of these visits he was informed of a profit-sharing life insurance policy, to be a $16,000 policy paid up in twenty payments of $1,000 per year. Dr. Lee testified that he told the sales agents he wanted income rather than insurance, and that they advised him there were five different ways in which such a profit-sharing policy would earn dividends over and above what an ordinary insurance policy might enjoy, that he would receive profits other policyholders would not receive, and that in a number of years there would undoubtedly be "stock splits." However, he knew that he was not buying stock in the company. A book, "Hidden Ways to Wealth," which outlined the experience of other similar companies, was left by Myers. Dr. Lee testified that the above book indicated, and defendant's agents told him, the policy would be self-supporting in five to seven years, and thus he would have to pay no more premiums after that period. According to Dr. Lee, Reklau gave him most of the figures.

Dr. Lee testified that he had perhaps ten visits with either Reklau, Myers and Rognlie, or any of the three together, and that they told him the regular dividend started at eight per cent and went as high as ten per cent, but could eventually be much more; and that also due to the fact that he fell within a certain age group, he was to receive an additional dividend of 11.9 per cent. These dividends, totaling approximately 21.9 per cent, were to be paid, accumulatively, on the total premiums paid in. That is, although no dividend would be paid on the first year's premium, at the end of the second year he would receive $219; at the end of the third year $438, etc.

Dr. Lee further testified that before he bought the policy Reklau showed him a yellow schedule of longhand computations concerning dividends, and stated that a 25 per cent minimum return on the policy was expected by the third year. Plaintiff testified that figures on the schedule indicated that at the end of 20 years he would get $443,373 for his investment, but that in conversation with Reklau the exact amounts were not given. On cross-examination Dr. Lee was asked if he actually expected to earn the money indicated by the figures on the yellow schedule. He replied that that was his expectancy, although he would have been moderately satisfied with considerably less.

Plaintiff, in fact, received a twenty-payment life insurance policy having a $16,074 face value, on an annual premium of $1,000. Dividends were to be computed on the basis of the annual premium as opposed to the total premiums paid. The policy, which Dr. Lee read, contained a clause stating that:

"Any apportionment, distribution of profits, or declaration of dividends

shall be at the sole and exclusive discretion of the Board of Directors and the methods and principles employed in the determination of such apportionment, distribution of profits, and declaration of dividends shall be conclusive upon all parties having or claiming any interest under this policy."

Dr. Lee testified that he did not presume the facts and figures quoted him, the expectancy of the company, what they were doing, and what they anticipated doing, could be written into the policy. He testified that he was, however, somewhat suspicious of the company, and tried to ascertain its integrity by consulting insurance and investment specialists. Finding nothing to militate against the company or the transaction, he relied on the representations of the salesmen and purchased the policy.

In the fall of 1957, officials from the State Department of Insurance were in Dr. Lee's office twice, investigating defendant. They did not, however, tell Dr. Lee what facts they were trying to ascertain. Dr. Lee did not write to the company at this time to ask what dividends it was going to pay because, "according to the way the information was given to me, they did not know at the time, but it would be handsome. That was the expression used."

On January 20, 1958, the defendant sent plaintiff a $100 dividend check and a letter stating that the dividend was 10 per cent of the annual premium. Dr. Lee testified he then learned for the first time that the dividends promised to him might not materialize. Ray Ross, defendant's General Sales Manager, contradicted Dr. Lee on this point, testifying he met with Dr. Lee in October of 1957 and at that time correctly explained what dividends could be expected. Dr. Lee denied that the matter of dividends was discussed at this meeting.

When Dr. Lee received the $100 dividend he wrote to the defendant, seeking the cause of the shortage, but before receiving an answer sought to prevent loss of the policy by paying his next premium. He testified it was not until later that, by means of a letter and the personal visit of Ross, he learned that the policy was not as he had supposed.

Cecil I. Hust, who was one of defendant's sales agents from September, 1954 until some time in 1957, testified that Ross had told him such a policy would pay itself out in six or seven years. Another sales agent, Don Pruitt, claimed that Ross compared this policy to one sold by Kansas City Life which had paid dividends starting at 25 per cent and increasing 15 per cent per year for 20 years, saying that defendant's policy would pay at least as much. Neil D. Nadeau, also one of defendant's sales agents, testified that Reklau gave him the yellow schedule when he first began work for the defendant in August or September of 1956, and he believed that Reklau issued the schedules to every salesman. However, Pruitt testified that he thought the yellow schedule was not passed out until he left the company in 1957.

Leo H. Rognlie was defendant's first witness. He testified that Dr. Lee did not meet Reklau until after he purchased his policy, and at that time saw him in regard to another policy for his son. He testified Dr. Lee was told that a 10 per cent dividend had been declared by the Board of Directors for 1956, and that no other figures were mentioned to Dr. Lee, except that the experience of other similar companies, some of which had paid 10, 15 and 20 per cent, was mentioned for comparative purposes. However, the witness testified, Dr. Lee was told that this policy was highly speculative, and there was no way of knowing how much the dividends would be. Rognlie testified that the yellow schedule was given by Reklau to the salesmen only as a recommendation to the effect that if the defendant company could set up a stock pool it would earn those amounts appearing on the schedule. Rognlie did not know the schedule was shown to Dr Lee.

Defendant's next witness was Osborne R. Myers. He testified Dr. Lee was told only that the company expected to pay a 10 per cent non-accumulative dividend and that, as the company grew, he would share in the profits proportionately. He gave Dr. Lee a book entitled "Hidden Ways to Wealth," dealing with the experience of stockholders in other insurance companies. Myers testified that Dr. Lee was not buying stock, and this book was given to him only to show that this type of company was doing well and would not fail. He testified that he never used the yellow schedule, for two reasons; first, it was an impossibility, and second, he did not have to lie to sell. Myers testified that Reklau placed the schedule with all of the agents in March or May of 1956, and at that time Myers told Reklau that it was something that should not be used; that it did not relate to what they were doing. He testified, however, that Dr. Lee's information in regard to the yellow schedule was gained through his contacts with Reklau after he had purchased the policy.

The evidence in the Pagett case is strikingly similar. Mrs. Pagett was first contacted in March, 1955 by Myers and Jack Page, another of defendant's salesmen. Her testimony was that they told her a 20 per cent dividend was to be paid on policies of this type, that it was to be paid on the accumulated premiums, and that the policy would be paying for the premium in a period of seven years; further, that following the pattern of other older companies, only a limited number of these policies would be sold and that, as a result of these discussions, believing she was buying primarily an investment, she purchased the policy and thereafter paid a premium of $500 per year for three years.

Mrs. Pagett also testified that in March, 1957, when the first dividend was paid, she received a sum equal to only 10 per cent of the annual deposit, or $50; that shortly thereafter, Reklau came to collect her next premium payment; that she asked him why she did not receive $100, and he told her the entire dividend was in fact 19¾ per cent, but the other $50 was being retained; that she was puzzled but, not knowing what to do, decided to wait until the next year.

In March, 1958, she received another check of $50, accompanied by a letter informing her that this was the entire dividend being paid. Now convinced that "there was something radically wrong with the whole thing," she did not cash this check or pay her 1958 premium. Instead, she went to see the Deputy Insurance Commissioner for the State of Oregon, and as a result, shortly thereafter, Mrs. Pagett met with Ross, defendant's General Sales Manager, who told her that dividends were not payable on the total premiums paid.

Defendant's witnesses denied that they had misrepresented the policy, testifying that they told Mrs. Pagett only that the minimum dividend expected was ten per cent, and would increase as the company grew larger.

■ *In limine* defendant challenges the jurisdiction of the District Court on the ground that in fact the amount in controversy in each case was less than $10,000. It points out that in Selman v. Shirley, 161 Or. 582, 85 P.2d 384, 91 P.2d 312, 124 A.L.R. 1, 16 (1938), an action for deceit, a plaintiff recovered damages based on the benefit of the bargain rather than reimbursement of out of pocket costs; that since each plaintiff sought general damages equal to the amounts they had paid in premiums, plus interest, they in effect asked to be placed in status quo and thus were pursuing actions in equity for rescission rather than actions at law for deceit.

It is evident that this argument completely ignores any mention of the allegation and prayer in each of the complaints, carried over into each of the pre-trial orders, regarding punitive damages.

Moreover, the Selman case does not indicate that to allow reimbursement of out of pocket costs would be inconsistent or even improper in an action for deceit. On the contrary, while the court favored the rule which gives to the defrauded

party the benefit of his bargain, it stated that if he is satisfied with only the amount that he actually lost, his damages will be so measured. Id. at 609, 85 P.2d at 394.

■ Defendant next contends that the court's findings that there was fraud in the sale of these insurance contracts, are not supported by the evidence or in law. The elements of actionable fraud were concisely set forth by the Oregon court in Conzelmann v. Northwest Poultry & Dairy Products Co., 190 Or. 332, 350, 225 P.2d 757, 764 (1950). They consist of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. In addition, the court observed that the person alleging fraud has the burden of proving it, and it must be established by evidence that is clear, satisfactory, and convincing. Id. at 350, 225 P.2d at 765.

Here there is ample evidence to support the court's findings. Dr. Lee testified that it was represented that there would be a general dividend of eight to ten percent, and an extra dividend because of his age, of 11.9 per cent; that both were to be based upon the accumulated premiums paid; that the policy would be self-supporting within five to seven years; that a minimum return of 25 per cent was expected by the third year; and that at the end of twenty years he would receive $443,373 for his investment. There was evidence that Mrs. Pagett also was told that she would receive a 20 per cent dividend, based upon the accumulated premiums paid, and that her policy would be self-supporting within seven years.

■ Not only was there evidence as to the misrepresentation of existing facts, such as the meaning of terms of the policy, but likewise the trial court could well believe that defendant's agents did not truly entertain the opinions as to future dividends which they espoused. Defendant cites authority to the effect that statements as to accumulations, dividends, surplus, etc., made in the sale of life insurance, are mere illustrations or estimates and their subsequent inaccuracy is no ground for redress. Annot. 22 A.L.R. 1284 (1923). Although it is true that expressions of opinion are ordinarily not actionable, still "the expression of an opinion not in reality entertained may constitute actionable fraud where it is stated falsely and with intent to deceive." Hansen v. Holmberg, 176 Or. 173, 156 P.2d 571, 574 (1945), quoting 23 Am. Jur. Fraud & Deceit § 32 (1939).

■ The trial court found in each case that the representations made by the salesmen and general agent were material, false, known by them to be false, and were made knowingly and willfully. The content of the representations, the circumstances under which they were conveyed, and the experience of the agents, all tend to support these findings.[1]

■ There is no doubt that the agents intended that the plaintiff should rely upon the representations and purchase the policy. There is also proof that the plaintiffs were ignorant of the falsity of the representations and that plaintiffs relied upon their truth. The mere fact that Dr. Lee may have been suspicious of defendant company and sought out the advice of others, does not preclude the fact of reliance on the statements of defendant's agents. Larsen v. Lootens, 103 Or. 579, 591–593, 194 P. 699, 203 P. 621, 624 (1922). Nor are we prepared to say that the fact that neither plaintiff, by reading the policy, was able to under-

---

1. The trial court found that the agents told Dr. Lee that in prior years the defendant had paid dividends equal to twenty per cent of the accumulated premiums. This appears to have no support in the record; however, because of the many other fraudulent misrepresentations, this error was not prejudicial.

stand its full impact, conclusively prevents reliance on the agents' assertions.

Defendant's witnesses denied making many of the representations. However, it is not for us to judge the credibility of the witnesses. This court is not the trier of facts, nor does it substitute its own judgment for that of the trial court. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.Rules Civ.Proc. rule 52(a).

■ Defendant next contends that "a corporation is not liable in punitive damages for the wrongful acts of its menial agents (here its salesmen), unless such acts were authorized or ratified." It is claimed that in this case these bases for liability were both lacking. We disagree.

Defendant cites Union Deposit Co. v. Mosely (Tex.Civ.App.), 75 S.W.2d 190 (1934), wherein it is stated:

"The mere fact that the officer is vice president, or state manager, of sales of a corporation does not bind the corporation for exemplary damages resulting from the fraud of such officer, unless it knowingly authorized or ratified the fraud; and it is generally held that the powers of a corporation are vested in its board of directors, and that the president, vice president, secretary, treasurer, or manager have no authority to represent or bind the corporation except as such authority has been conferred by the board of directors; and that in absence of evidence showing that such an officer was authorized to act for the corporation in practicing a fraud, or that the corporation in some manner knowingly authorized or ratified the fraud, it is not liable for exemplary damages resulting from the fraud of such officer or agent."

The courts are not in complete accord on this matter (15 Am.Jur. Damages § 292 (1938)), and the Oregon law which binds us does not adhere to the strict rule of the Mosely case.

In Pacific Telephone & Telegraph Co. v. White, 104 F.2d 923 (9th Cir. 1939), this court discussed the Oregon cases. They indicate that whether or not a corporation can be mulcted in damages depends upon the dignity of the agent's authority, and that a corporation is not liable in punitive damages for the wrongful act of a "menial" agent unless such act was authorized or ratified. Pelton v. General Motors Acceptance Corp., 139 Or. 198, 7 P.2d 263, 266, 9 P.2d 128 (1932).

In White the company's agent, Hansley, while acting within the scope of his employment, committed an assault and battery upon the plaintiff, White. Hansley had the duty to "investigate cases of damage to company property by outsiders, or damages to outsiders by company property or employees, [and] the loss of funds or matters that may become controversial with regard to outsiders." His duties were of a "staff nature," to make a complete and full investigation and assist the law enforcing officers. The assault was the culmination of fruitless efforts to secure information from White as to the identity of perpetrators of an assault and robbery which had been committed in a holdup of the company's cashier. The court said:

"It appears from the foregoing recital of facts that Hansley was not a menial employee or servant of the appellant company, but was vested with a certain amount of discretion and, within bounds, the exercise of independent judgment. * * * Were it not for its officers and agents, a corporation could not act; they perform its functions and formulate its policies. It is not contended that the ranking officers specifically directed and commanded Hansley to set upon and beat White or that they commended Hansley for so doing, but the man who was assigned to investigate such cases did assault White while act-

ing within the scope of his employment—so the jury found—and it is not within the province of this court to disregard this finding of fact and exonerate appellant from blame because the specific act may not have been authorized or directed by some officer superior to Hansley." Id. at 925–926.

In the case at bar, the defendant sent sales agents out to exercise their powers of persuasion in soliciting orders for defendant's "profit-sharing policy." In this pursuit the agents were "vested with a certain amount of discretion and, within bounds, the exercise of independent judgment," and thus were not menial agents. Id. at 925. Although the specific representations may not have been authorized by a ranking officer, the trial court found that they were made by the salesmen while acting within the scope of their authority, and these findings are adequately supported in the record.

Defendant makes certain contentions with respect to the effect of waiver on the right of plaintiffs to proceed on the basis of rescission. In light of our conclusion that plaintiffs were not proceeding under such a theory, but were suing for damages, these contentions are irrelevant.

■ Defendant contends, however, that both of the plaintiffs made premium payments after learning of the fraud, and that by doing this they waived their rights to sue for damages. The authorities cited by defendant do not support this contention. Massachusetts Bonding & Ins. Co. v. Anderegg, 83 F.2d 622 (9th Cir., 1936); Farrington v. Granite State Fire Ins. Co., 120 Utah 109, 232 P.2d 754 (1951); Sheppard v. Blitz, 177 Or. 501, 163 P.2d 519 (1945); Whitney v. Bissell, 75 Or. 28, 146 P. 141, L.R.A. 1915D, 257 (1915); and Scott v. Walton, 32 Or. 460, 52 P. 180 (1898), all discuss the matter of waiver in connection with rescission. We reiterate that this is an action for damages. Likewise, the dictum in Browning v. Rodman, 268 Pa. 575, 111 A. 877 (1920), to the effect that part

payment constitutes a waiver, affords defendant no assistance because it relates to contracts that are wholly executory.

In 24 Am.Jur. Fraud & Deceit § 216 (1939) the statement is made that "if the party complaining of the fraud has partly performed his part of the contract before learning of the deceit practiced upon him, so that the contract, as to him, is not wholly executory, he will not be precluded from maintaining an action for damages for the fraud, even though he goes ahead and completes his contract." We believe that this statement exemplifies the law as announced by the Oregon Supreme Court in Selman v. Shirley, 161 Or. 582, 85 P.2d 384, 91 P.2d 312, 124 A.L.R. 1, 16 (1938). That was a suit for damages for fraud in the sale of land. Plaintiff, after learning of the false representations, paid an installment of $200 on the contract and retained the property. The payment was made with the understanding that defendant would make good the representations. This not being done, plaintiff sued for damages. The court said:

> "It has been many times stated by this court that a defrauded party is not required to rescind the contract in order to sue for deceit, and that if he affirms the contract he does not thereby waive his right to recover damages for the fraud which had been practiced upon him." Id. at 593, 85 P.2d at 387.

Of course, if the plaintiffs and defendant had entered into other agreements affecting the same transaction, perhaps there would be a waiver and relinquishment of all right to damages. See 24 Am.Jur. Fraud & Deceit § 214 (1939). However, they did not do so here.

■■ Defendant's next contention is that the plaintiff, Margaret L. Pagett, is barred by the Oregon statute of limitations. ORS 12.110 provides that an action at law for fraud or deceit must be commenced within two years from the discovery of the fraud or deceit. Mrs. Pagett filed her action on June 3, 1959.

Defendant claims that Mrs. Pagett discovered, or should have discovered, the fraud in March, 1957, the time when she received the dividend check and letter from defendant explaining that the enclosed $50 dividend was the earning on her policy for that year. It is true that the statute runs from the time when, by the use of reasonable diligence, the fraud could have been discovered. Linebaugh v. Portland Mortgage Co., 116 Or. 1, 239 P. 196 (1925). However, the question is a factual one and the trial court found as follows: "[Mrs. Pagett] questioned Mr. Reklau concerning the discrepancy between the promises made by the salesmen and the dividends received. Mr. Reklau told her that her policy had earned a 19¾ per cent dividend, had been retained by the company to cover various expenses which he did not enumerate, and upon which he was vague." The trial court further found that it was not until about March 31, 1958, a year later, that Mrs. Pagett learned for the first time that the representations made to her by the salesmen were false. Taken as a whole, these findings imply Mrs. Pagett was not chargeable with knowledge that the representations were false. If the finding to the effect that she tried to discover the reason for the shortage in dividends was not directed to the matter of reasonable diligence, it would serve no function at all. We are reluctant to hold that there was no purpose behind its inclusion among the findings of fact.

Moreover, the trial judge found that "within two years from the discovery of the fraud, plaintiff affirmed the contract and filed her action for damages." This term, "discovery of the fraud," is employed in the Oregon Statute of Limitations and has been interpreted to mean "from the time the fraud was known *or could have been discovered through the exercise of reasonable diligence.*"

Linebaugh v. Portland Mortgage Co., 116 Or. 1, 8, 239 P. 196, 198 (1925). Of course, if the court had found that plaintiff filed her action within two years from the discovery of the fraud "within the meaning of the Oregon statute," this finding might not be binding upon us, as being one of mixed law and fact. See United States v. United States Gypsum Company, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948); United States v. Armature Rewinding Co., 124 F.2d 589, 591 (8th Cir., 1942). Still the fact that the Oregon statute has been interpreted broadley is persuasive that when the court couched its finding in the same language as that employed by the statute, it meant those words in that broad sense.

From our examination of the record we do not feel that we can say that these findings are clearly erroneous. In light of the circumstances, the letter which Mrs. Pagett received was not completely free from ambiguity, and it is not for us to say that the potency of those written words should outweigh that of Mr. Reklau's assurances.

▆▆▆ Defendant's last point is utterly devoid of merit. Mrs. Pagett's complaint was filed more than three years after the cause of action accrued, but no allegation appeared therein showing when she learned or should have learned of the fraud. This rendered the complaint subject to motions to dismiss or for summary judgment on the ground that the right to prosecute the action was barred by the Oregon two-year statute of limitations. However, defendant made no such attack on the complaint, contented itself with raising the issue by answer, and thus waived any deficiency in the pleading.

The judgments of the District Court are affirmed.