**William Earl GSELL, Plaintiff,**

v.

**John N. ADAMS, III, C. A. Dumbeck, and Donald Rowberry, Defendants.**

**Civ. No. 68–489.**

United States District Court,
D. Oregon.

Dec. 24, 1969.

Duane A. Bartsch, Smart & Bartsch, Portland, Or., Thomas A. Huffman, Huffman & Zenger, Hillsboro, Or., for plaintiff.

M. Dayle Jeffs, Provo, Utah, William C. Martin, Dusenbery, Martin, Beatty, Bischoff & Templeton, Portland, Or., for John N. Adams, III.

Willner, Bennett & Leonard, Portland, Or., for C. A. Dumbeck.

## OPINION

SOLOMON, Chief Judge:

William E. Gsell brought this action against John N. Adams, III, C. A. Dumbeck, and Donald Rowberry to recover a $7,500 franchise fee and other damages caused by his reliance on defendants' fraudulent statements. Gsell also seeks punitive damages. Plaintiff is a resident and all of the defendants are non-residents of the State of Oregon.

## ADAMS AND ROWBERRY

Adams, Rowberry, Dunham, and Hedricks were the principals of Estate Protection Service (EPS), an organization which sold its services as an estate planner and manager to investors who were willing to deposit money into EPS trusts. In late 1966 and early 1967, when EPS first began to operate, it held several meetings to recruit securities and insurance salesman from Oregon, Washington, and Idaho to sell its services.

In early January, 1967, Dumbeck, EPS's representative for the northwest states, invited Gsell, an insurance and securities salesman from Portland, Oregon, to a recruitment meeting in Seattle, Washington. At the meeting, Adams told the salesmen that EPS had developed a trust service that could be sold to insurance and investment customers and that it had operated the service successfully for a year. Adams said that EPS had made a thorough study of the legality, workability, and salability of the service and had found that it was sound, workable, and legal in Oregon, Washington, and Idaho. He told the salesmen that they could purchase franchises from EPS and that they also could purchase shares of EPS's gross income by making additional contributions.

After the meeting, Gsell sought to obtain information about EPS. He called both the Oregon Corporation Commissioner and the United States Post Office to find out if they knew anything about the organization, but they did not. He also called a friend in San Francisco, who said he had sold trusts in California several years earlier. In mid-January, Gsell decided to join EPS, notified the organization of his decision, and borrowed $7,500 from his bank.[1] Rowberry visited Gsell in Portland and accepted the $7,500 for a franchise and share of the EPS income. Rowberry also enlisted R. P. Chvatel as an EPS representative to work under Gsell.

EPS instructed Gsell to find an attorney to handle EPS's legal problems in Oregon. Gsell learned from a friend that James Ellis, an attorney, might represent EPS, so he called Ellis to see if he would attend a second recruitment meeting on February 9 in Portland. Ellis was not available, but Robert Groce, Ellis's partner, agreed to go with Gsell. At the meeting, Rowberry repeated the statements that Adams made in Seattle.

After the Portland meeting, Groce discussed EPS with Gsell several times. He also discussed EPS with Adams and Rowberry. In late February, he told Gsell he would not represent EPS and said it was possible that EPS's activities constituted the illegal practice of law in Oregon.

Gsell complained to Adams and Rowberry about Groce's report. They assured Gsell, however, that Groce was wrong and insisted that they had covered the possible illegality of the service in their preliminary research and had found that the service was legal.

Later, Rowberry told Gsell that he had talked to Groce again, had resolved the problem to Groce's satisfaction, and had convinced him to represent EPS. When Gsell called him, however, Groce said once

---

1. The bank manager told Gsell that he knew Adams' father and that the father was an intelligent and capable man.

again that he would not represent EPS. Gsell was worried, and asked Adams and Rowberry to find another local attorney. Adams promised to find someone, and mentioned several names. He added that they had counsel in Seattle and elsewhere who would handle EPS's Oregon problems until local representation was arranged. Later, Adams visited Gsell and told him that EPS had changed its procedures and that the legal staff in the San Jose home office would do all the legal work.

In May, 1967, Gsell sold two trusts, one to an old friend who had been his investment customer for at least eight years. He sent the trust applications and money to San Jose, and the home office returned the completed trust agreements.

Gsell continued to look for EPS customers through the summer of 1967. He became aware, however, that EPS was having financial problems and that its sales force was shrinking. In the fall of 1967, he discontinued his efforts to sell for EPS.

In June, 1968, Gsell's two trust customers called him and said the Oregon Tax Commissioner had raised questions about their trusts. Gsell asked them to obtain specific information from the Commissioner and wrote to Adams about the problem. When Adams did not answer, Gsell made several telephone calls and found that Adams had gone to Brazil. When Adams returned, he sent his associate Dunham to talk to Gsell's customers. Dunham went with Gsell to the Oregon Inheritance Tax Department to see if the problem could be solved. The Department officers told them that the trusts, as drawn, were subject to double gift taxes.

Dunham returned to San Jose and told Adams what the Tax Department had said. Dunham called Gsell and promised to return to Portland in two or three weeks to retain an attorney to correct the trusts. He also told Gsell that Adams would borrow $20,000 and set up a new

Oregon office. After three weeks, Dunham returned to Portland and later reported that he was unable to find an attorney to represent EPS.

Immediately thereafter, Gsell quit EPS and asked for the return of his and his customers' money. Although his customers did not demand that he refund their money, he promised to return it to them regardless of whether he recovered it from EPS. He also paid Chvatel $500 for his services.

Many of Adams' and Rowberry's statements were false. EPS had not operated successfully for a year before the Seattle meeting. It had not studied the legality or workability of the trust service in Oregon. It did not have local counsel in Seattle. Adams and Rowberry knew these statements were false. In addition, they knew or should have known that EPS was illegal and unworkable in Oregon.

■ Adams and Rowberry assert that Gsell could not reasonably have relied on their statements because he was a graduate of the University of Kansas School of Business and had some business experience. The misrepresentations, however, involved legal questions, not business questions, and Gsell had no legal experience.

■ Adams and Rowberry also assert that Gsell waived his right to damages for fraud when he continued to represent EPS after Groce told him it was possible that EPS's activities were the illegal practice of law.

They cite Taute v. Econo-Car Int'l, Inc., 414 F.2d 828 (9th Cir. 1969). In that case, Taute paid $6,000 for a franchise before he learned of the falsity of certain representations. After he discovered the fraud, he prepared to operate the franchise. He selected a place from which to operate, quit his job, negotiated changes in the franchise agreement, and did operate the franchise. He did not

mention the misrepresentations until after he closed the business 16 months later. The Court of Appeals held that Taute had waived his right to damages for fraud.

*Taute* is not applicable to this case. Here, Gsell did not realize that the representations were false until July, 1968. Although Groce's report raised doubts in Gsell's mind, Gsell mentioned his doubts immediately and was assured they were unfounded. In addition, he did not re-negotiate the franchise contract after he received Groce's report.

Equitable Life & Casualty Ins. Co. v. Lee, 310 F.2d 262 (9th Cir. 1962), is more in point. Lee was induced to purchase insurance by fraudulent promises of large dividends. Before paying the first premium, he became suspicious and consulted insurance and investment specialists, who did not confirm his suspicions. His first dividend check was smaller than he expected and he wrote the company for an explanation. Before receiving an answer, he paid his next premium to prevent his policy from lapsing. Later, he found he had been deceived.

In a companion case to *Lee,* Pagett was the victim of the scheme. When the company's agent approached her for her second premium, she asked why her first dividend was not what she expected. The agent told her the dividend was what she expected but part of it was being retained by the company. She was suspicious but decided to see what would happen the next year and paid the premium.

The insurer argued that Lee and Pagett waived their rights to damages for fraud when they paid premiums after becoming suspicious. The Court of Appeals held that they were entitled to affirm the contract without waiving the right to damages for fraud. The Court distinguished cases in which the victim negotiated a new contract after learning of the fraud, or in which the victim learned of the fraud when the contract was wholly executory. It permitted Pagett and Lee to recover as damages the premiums they had paid.

I believe that *Lee* applies to this case. When Groce's report raised doubts in Gsell's mind, both Adams and Rowberry assured Gsell that Groce was wrong. If Gsell had known that the service was illegal and unworkable, he would not have sold a trust to his longtime friend and customer. I find that Gsell did not waive his right to damages for fraud.

█ Gsell collected $3,955.00 from his customers and received a 40 per cent commission, or $1,582.00. He paid $7,500 for the franchise and share of EPS's gross income, and paid $500 to Chvatel. In addition, he incurred at least $1,000 in expenses and time lost while promoting EPS. I find that Gsell is entitled to $11,373.00 general damages.

█ I also find that the conduct of Adams and Rowberry was willful and malicious, and that this is an appropriate case for punitive damages. See Lewis v. Worldwide Imports, Inc., 238 Or. 580, 395 P.2d 922 (1964). I find that $10,000 is a reasonable amount to be allowed as punitive damages against Adams and Rowberry.

### DUMBECK

Dumbeck, Hayes, and Wood operated an insurance and securities brokerage firm in Seattle. From 1963 to 1966, Dumbeck was manager for the northwest states for Old Line Life Insurance Company and was responsible for Old Line Life's agents in Oregon. At that time, Gsell was the Oregon general agent for Old Line Life and dealt with the home office through Dumbeck. Gsell and Dumbeck both left Old Line Life in 1966.

Later that year, Adams called Hayes and invited Hayes, Dumbeck, and Wood to Los Angeles to discuss a company he was trying to organize. Dumbeck had

never heard of Adams, but he knew that Hayes was acquainted with Adams. The partners flew to Los Angeles to learn about Adams' company. Adams and Rowberry met them at the airport and took them to an office, where Adams and an "elderly gentleman" made a presentation on the proposed organization. The partners did not trust the "elderly gentleman," and refused to have anything to do with the company. After the meeting, Rowberry took them to the airport.

In December, Adams again called Hayes. Adams said that he had formed his own corporation, Estate Protection Service, with the same program, but without the help of the "elderly gentleman." He requested the partners to set up meetings of insurance and securities salesmen so that he could recruit them for his company. Dumbeck agreed to call the meetings and to take charge of his firm's dealings with EPS.

Before the recruitment meetings, Dumbeck signed a contract which made him EPS's representative for the northwest states. Adams wanted the partners to contribute $40,000 to EPS, but they insisted on waiting to see if EPS was successful and "proper." The partners were willing to give EPS an installment note, but Adams would not accept it.

On January 2, 1967, Dumbeck called Gsell and told him that some men were starting a new service that could be sold to investment and insurance customers, and that he was calling a meeting in Seattle so that these men could make a presentation to a hand-picked group of investment and insurance salesmen from Washington, Oregon, and Idaho. Dumbeck said that he knew these men, and that they were of high repute and integrity. He invited Gsell to attend the meeting and Gsell accepted.

At the Seattle meeting, Dumbeck acted as master of ceremonies and introduced the group to Adams, Rowberry, Dunham, and Hedricks, the principals of EPS. At the end of the meeting, the EPS principals told the members of the group that Dumbeck was EPS's representative for the northwest states and that members of the group should call Dumbeck if they wanted franchises. When Gsell decided to join, he called Dumbeck, who sent him an instruction manual and notified Rowberry that Gsell wanted a franchise. Later in January, Dumbeck again called Gsell and invited him to the Portland meeting. At that meeting, Dumbeck again acted as master of ceremonies.

From the day he met Adams, Dumbeck suspected both Adams and his associates in EPS. Although Dumbeck's financial statements show that he was worth about $250,000, he refused to make a cash contribution to EPS. Almost immediately after the Portland meeting, the men working under Dumbeck began to complain that they were encountering legal problems. When Gsell complained to Dumbeck about Groce's report that EPS's activities might be illegal, Dumbeck failed to tell Gsell either of his own suspicions or of the complaints of the salesmen. A month later, in the latter part of February, when Dumbeck decided that his suspicions were correct and that Adams and his friends were crooks, he quit EPS.

In April, Gsell called Dumbeck for advice and learned for the first time that Dumbeck had quit EPS. Dumbeck did not say he quit because he thought Adams and his associates were crooks. He said he quit because he had affiliated with another company, had taken on 100 new securities salesmen, and was too busy to work with EPS.

In December, 1967, after Gsell had stopped promoting EPS, he called Dumbeck again to discuss EPS. This time, Dumbeck told Gsell he quit because Adams would not accept his firm's installment note as the firm's contribution to EPS. Dumbeck again failed to mention his suspicions of Adams and his EPS associates. It was only after Gsell brought this action, in the fall of 1968, that Dumbeck admitted that he quit EPS because

he thought Adams and Rowberry were crooks.

■ I find that Dumbeck falsely represented to Gsell that he knew the EPS people and that they were men of high repute and integrity. Dumbeck also falsely represented that he quit EPS because he was too busy with other matters.

There is no merit to Dumbeck's contention that he was expressing an opinion and not a fact when he stated that Adams and his associates were of high repute and integrity. The evidence showed that Dumbeck had met Adams only once before the Seattle meeting. That was when Dumbeck went to Los Angeles at the suggestion of Adams. At this meeting, Dumbeck became so suspicious that he refused to have anything to do with the proposed venture. I believe that Dumbeck was suspicious of Adams from the start. He knew nothing about Rowberry, Hedricks, and Dunham.

Dumbeck knew that Gsell came to the Seattle meeting because Gsell had worked under him in the insurance business and Gsell trusted him. Dumbeck also knew that Gsell had borrowed $7,500 to pay for the franchise and share of EPS's gross income. He arranged for Gsell to pay the money to Rowberry, yet he did not tell Gsell of his suspicions or that he had not put up his own money. Neither did he correct his earlier statements about his knowing Adams and his associates and about their high repute and integrity.

■ The statement of an opinion not actually held, or the reckless statement of an opinion by one with special knowledge, constitutes fraud. Equitable Life & Casualty Ins. Co. v. Lee, *supra;* Lackey v. Ellingsen, 248 Or. 11, 432 P.2d with his money because of his reliance on Dumbeck's fraudulent representations. 307 (1967). In my view, Gsell parted Dumbeck therefore is liable for the damage suffered by Gsell.

I find that Gsell is entitled to recover $11,373.00 general damages from Dumbeck.

■ Gsell alleged fraud in the pretrial order, but he did not specify the statements I rely on here to hold Dumbeck liable. Dumbeck did not object to evidence of those statements at the trial or during discovery. He was not prejudiced by Gsell's failure to allege them with particularity in the pretrial order. After the trial, I permitted Dumbeck to file a memorandum on the legal effect of those statements. I will amend the pretrial order to conform to the proof, as provided by Rule 15(b), Fed.R.Civ.P. *Cf.* Lomartira v. American Automobile Ins. Co., 371 F.2d 550 (2d Cir. 1967); Southern Pacific Co. v. Libbey, 199 F.2d 341 (9th Cir. 1952); Hester v. New Amsterdam Casualty Co., 287 F.Supp. 957 (D.S.C. 1968).

Gsell is entitled to a judgment against Adams, Rowberry, and Dumbeck for $11,373.00 general damages. He is entitled to an additional judgment against Adams and Rowberry for $10,000.00 punitive damages.

This opinion shall serve as findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.